[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 20, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-14007

_____

Agency No. A97-939-529

LUC LORDEUS, JUNIOR,

Petitioner,

versus

U. S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(October 20, 2008)**

Before BIRCH and MARCUS, Circuit Judges and FORRESTER,[*] District Judge.

PER CURIAM:

_____

[*]Honorable J. Owen Forrester, United States District Judge for the Northern District of Georgia, sitting by designation.

Luc Junior Lordeus seeks review of the Board of Immigration's ("BIA's") order affirming the Immigration Judge's ("IJ's") decision denying his application for asylum and withholding of removal under the Immigration and Nationality Act ("INA") and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231(b)(3), 8 C.F.R. § 208.16(c). The record does not compel the conclusion: (1) that Lordeus suffered past persecution based on the cumulative effects of the incidents that all originated on 17 December 2003, including the one-time beating and subsequent week-long detention; or (2) that Lordeus has a well-founded fear of future persecution that is objectively reasonable, because the Lavalas party is no longer in power in Haiti, and Lordeus failed to demonstrate that he could not avoid a future threat by relocating to another region in Haiti. Thus, substantial evidence supports the BIA's conclusion that Lordeus failed to meet his burden of showing that he was entitled to asylum. As such, Lordeus necessarily failed to establish eligibility for withholding of removal and CAT relief. Accordingly, we DENY Lordeus's petition for review.

## I. BACKGROUND

Lordeus, a native and citizen of Haiti, entered the United States without inspection or parole on or about 20 February 2004. AR at 417. On 12 May 2004, the Department of Homeland Security ("DHS") issued Lordeus a Notice to Appear

("NTA"), charging that he was subject to removal under INA § 212(a)(6)(A)(i), 8 U.S.C. § 1182(a)(6)(A)(i), as an alien present in the United States without being admitted or paroled. Id.

On 6 April 2004, Lordeus filed an application for asylum, withholding of removal, and CAT relief. Id. at 359–72. Lordeus indicated on the application that he sought asylum and withholding of removal based upon his political opinion and membership in a particular social group. Id. at 363. Lordeus stated that he was "really affraid [sic] of returning to Haiti because [he knew] that [his] life [was] still in great danger and returning to [his] country [would] cause [him his] life." Id. According to Lordeus, he and his family were members of "O.P.L." and both he and his "sibling" used to attend meetings. Id. at 364. Lordeus feared being subjected to torture in Haiti "because [his] persecution never ended." Id.

In an attachment to the application, Lordeus explained that he was seeking asylum because he and his family were persecuted by the Lavalas Party supporters ("Lavalas supporters"). Id. at 369. Lordeus explained that, on 17 December 2003:

> a group of men came to my Mother's house, I was grab[bed] by the hair and slam[med] against the walls, my Mother was beaten very badly also, I [was] arrested and taken to jail for 1 week.
>
> I was beaten very badly during interrogation. I was [a] member of a group named University Quisqueya of Haiti. The Student[s,] as everyone[,] wanted a change to Haiti because there is too much injustice in Haiti.

3

My Family and I were mistreated, threaten[ed,] and torture[d].

Id. Lordeus "seriously feared" returning to Haiti because he believed he would be killed. Id. Lordeus attached a copy of his birth certificate and passport. Id. at 370–72.

At the hearing on 20 April 2005, Lordeus, who was then represented by counsel, admitted to the allegations in the NTA and conceded removability. Id. at 257. The IJ accepted a copy of the State Department's 2004 Country Report on Human Rights Practices for Haiti ("2004 Country Report") into evidence. Id. at 259–60. On the same day, Lordeus filed additional documents in support of his application, including: (1) an addendum to his asylum application; (2) a letter from the Vice President of Academic Affairs, who attested that Lordeus had been registered in a program at the University of Quisqueya ("University") from March to July 2003; (3) an affidavit from Kathleen Lordeus[1]; (4) a copy of Kathleen's University ID card; and (5) a 11 March 2005, U.S. Department of State travel warning for Haiti ("Travel Warning").[2] Id. at 348–58.

---

[1] Lordeus's sister, Kathleen, is sometimes referred to as "Katteline" in the record. See AR at 354.

[2] Lordeus also stated that he was filing the State Department's 2005 Country Report on Human Rights Practices for Haiti ("2005 Country Report") as "Exhibit #6," but a copy of that report is not included in the record. See generally AR. As previously mentioned, the record does, however, include the 2004 Country Report. AR at 392–411.

4

In his addendum, Lordeus stated that he and his cousin, Serge Pierre, who was a professor in Cap Haitien, were "general participants in rallies against the Lavalas government." Id. at 350. Lordeus stated that, "[o]n December 5 2003, members of the Lavalas government broke into one of the universities and beat several students and smashed furniture in an attempt to stifle the students' activities." Id. Lordeus claimed that he had a videotape of the incident. Id. On 17 December 2003, he and Serge participated in a student rally where Lavalas supporters threw rocks and bottles at them. Id. He and Serge "fled the rally and went home late that night in order to avoid being followed and [to] avoid trouble by Lavalas thugs." Id. At around midnight, several heavily armed Lavalas supporters came to Lordeus's home, beat him, and hit him in the stomach. Id. Lordeus stated, "I still feel the effects of the blows today." Id. Lordeus claimed that the Lavalas supporters also beat Serge, and, when his mother began to scream, one member "hit her with his hands to shut her up." Id. Lordeus recognized two "head Lavalas members," Renee Civile and Nawoon Marcellus. Id. The Lavalas supporters drove Lordeus and Serge to a prison where they were interrogated "for a long time [in an attempt] to get further information about [their] anti-Lavalas activities." Id. After about one week, and "a lot of pressure from journalists and radio," Lordeus and Serge were released and they immediately went into hiding.

5

Id. Lordeus finally left Haiti for the United States to save his life after his uncle told him the Lavalas supporters were looking for him. Id.

In her affidavit, Kathleen stated that (1) Lordeus was not able to continue his studies at the University "because of the socio-political problems of the country," and (2) Lordeus "had been very active against the fallen regime." Id. at 354. Kathleen explained that Lordeus

> had been so persecuted that sometimes he could not go home. The worst thing was, one day while we were at home some armed thugs came to our house and arrested my little brother Junior and my cousin Serge Pierre. They spent one week in jail, after several legal steps they finally got their freedom. Junior was forced to leave the country to save his life against the armed activists. Unfortunately, my cousin Serge Pierre almost lost his life because he could not leave.

Id. Kathleen's ID card indicated that she was admitted to the University in September 2004. Id. at 356. The Travel Warning stated that visitors and residents should remain vigilant in Haiti due to "the potential for spontaneous demonstrations and violent confrontations between armed groups" and "due to the absence of an effective police force in much of Haiti." Id. at 358.

The 2004 Country Report stated that President Aristide resigned on 29 February 2004, and an interim government was installed. Id. at 392. A Tripartite Counsel, consisting of one member from Aristide's Lavalas Party, one member from the Democratic Platform, and one member from the international community, was formed. Id. Haiti suffered instability immediately following Aristide's

6

departure, which "made the justice system inoperative for a few months." Id.

During the year, there were "credible reports of arbitrary killings" by the police

and pro-Lavalas partisans. Id. at 393. The report stated that systematic, state-

orchestrated abuses stopped under the interim government, but politically-

motivated violence continued, and there were numerous human rights abuses

against Aristide supporters. Id. The interim government's ability to create a more

secure environment remained limited by year's end, and there were credible reports

of politically-motivated disappearances. Id. at 393–94. Although Aristide had

filled many key police force positions with allies, the interim government

"inducted one class of new recruits, all of whom were vetted by the human rights

community." Id. at 396. In addition, the United Nations established a civilian

police force to supplement the national police. Id. There were several reports of

arrests of pro-Lavalas supporters. Id. at 397. In the days after Aristide left office,

conflicts between the opposition groups increased, with instances of abuse reported

on both sides. Id. at 399. The report indicated that, by year's end, the interim

government's police force controlled central Port-au-Prince, pro-Aristide groups

maintained control of many of the Port-au-Prince slums, and anti-Aristide rebels

controlled many of the towns in the countryside. Id. From 30 September through

November, pro-Aristide partisans in Port-au-Prince launched a destabilization

campaign that included kidnaping, decapitation, and burning of police officers and

7

civilians. Id. at 400. In response to the campaign, the police conducted sweeps in search of the perpetrators. Id. at 401. Stated differently, the country remained unstable and chaotic.

Prior to his removal hearing, Lordeus filed two VHS cassettes along with an English transcript, and pictures of Serge's injuries. Id. at 376–87.

At the 5 December 2005 removal hearing, Lordeus testified in accord with his petition's allegations as noted above. After release from the week's incarceration, Lordeus and Serge went into hiding for two months in another city before Lordeus came to the United States. Id. at 317–18. After Aristide left office, Serge, who had returned to Port-au-Prince in March 2004, was beaten and shot by Lavalas supporters. Id. at 318–20. Lordeus stated that, at the time of the hearing, Serge lived in Port-au-Prince. Id. at 319. Neither Lordeus nor Serge had problems while they were in hiding. Id. at 320.

In his written order, the IJ denied Lordeus's application for asylum, withholding of removal and CAT relief, and ordered Lordeus removed to Haiti. Id. at 203. In his oral decision, the IJ stated that he did not dispute that the 17 December 2003 incidents Lordeus testified about had occurred. Id. at 212–13. However, the IJ found that the events did not rise to the level of past persecution. Id. at 213. The IJ found that Lordeus's claim to a well-founded fear of future persecution was undermined because his family remained in Haiti, and his sister

8

continued her studies at the University.  Id. at 213–14.  Moreover, the Lavalas government that Lordeus feared was no longer in power and, while the Lavalas supporters continued to undermine the government, the support had diminished. Id. at 213.  Although Serge was allegedly targeted, he remained in Haiti, and there was no evidence that he was harmed on account of any protected ground.  Id. at 214.  Lordeus also had not shown that he suffered countrywide persecution, or that he was unable to relocate, and the IJ noted that Lordeus had remained unharmed in Haiti for two months following the beating and detention.  Id. at 213–14.  The IJ also found that there was no evidence that Lordeus was targeted or singled out on account of his political opinion, and the fact that Lordeus was released by the Lavalas supporters after being paid a bribe undermined the notion that he was sought for his political views.  Id. at 215.  The IJ also noted that there were some inconsistencies in Lordeus's testimony concerning when he attended the University.  Id. at 216.

Lordeus filed a notice of appeal in which he claimed that the IJ erred in its findings that Lordeus:  (1) did not meet his burden of proving past persecution or a fear of future persecution; (2) would not be persecuted in light of the regime change; (3) did not present evidence of persecution on account of any enumerated grounds; and (4) testified inconsistently about when he attended the University.  Id. at 192, 197–98.

9

In his accompanying brief, Lordeus argued that the IJ erred in finding that he did not suffer past persecution based on the 17 December 2003 incidents where: (1) he was pelted with rocks and bottles; (2) the Lavalas supporters slapped his mother and hit Lordeus "so hard in his stomach that the traumatic pain subsisted long after"; and (3) Lordeus and Serge were taken to a prison, "interrogated with more violence, then thrown in a cell, and left to die." Id. at 11, 20–21. Lordeus had a well-founded fear of future persecution because he demonstrated more than a 10% chance of being persecuted. Id. at 22. Lordeus also contended that the IJ erred by finding that he would not be persecuted because of the regime change and United Nations presence, even though Lordeus presented government documents warning against travel there. Id. at 23–25. Further, Lordeus argued that the IJ erred in finding that Lordeus did not have a political opinion because Lordeus "can prove that he was persecuted based on his participation in student groups." Id. at 26. Finally, Lordeus argued that the IJ erred in affording too much weight to Lordeus's testimony regarding his attendance at the University because it was not a material fact in the case. Id. at 28–29.

The BIA dismissed Lordeus's appeal. AR at 2. The BIA found that the record did not support Lordeus's claim of past persecution because neither the throwing of rocks and bottles nor the beating and detention rose to the level of persecution. Id. at 3. The BIA stated that the record also supported the IJ's finding

that Lordeus's family, including Serge, remained in Haiti without further problems. Id. at 3. Although crime remained high and there were clashes among the various political factions, "such chaotic conditions, without more" was not enough to qualify Lordeus for asylum. Id. Therefore, Lordeus failed to show that he had a well-founded fear of persecution. Id. Moreover, the BIA noted that Lordeus had successfully relocated to another area for two months before coming to the United States. Id. Therefore, Lordeus had not established that internal relocation was unavailable. Id. The BIA acknowledged that violence continued in Haiti after Aristide left the country in February 2004. Id. The BIA also found that Lordeus was not entitled to withholding of removal or CAT relief because "the record does not demonstrate a threat to his life or freedom or that it is likely that he would be tortured in Haiti with the acquiescence of the government." Id. at 3–4. The BIA declined to address Lordeus's arguments relating to the IJ's findings that (1) the incidents were not on account of a statutorily protected ground, and (2) Lordeus had testified inconsistently about when he attended the University. Id. at 4 n.1.

## II. DISCUSSION

Lordeus argues that the BIA erred in finding that he failed to meet his burden of proving past persecution and a fear of future persecution because he adequately presented evidence sufficient to demonstrate both. Moreover, he claims that he demonstrated that the Lavalas supporters attacked and beat students often.

11

Lordeus contends that he suffered past persecution based on three incidents he suffered at the hands of the Lavalas supporters because of his participation in opposition rallies, and the BIA erred in concluding otherwise. Specifically, Lordeus claims past persecution because Lavalas Party supporters threw bottles and rocks at him, beat him, kidnaped him and held him for one week. Further, Lordeus asserts that, even though members of his family remained in Haiti, his fear was not diminished. He contends that the BIA erred in determining that he did not have a well-founded fear of future persecution because the undisputed evidence showed a pattern or practice of the Lavalas supporters persecuting students. Moreover, Lordeus claims that the regime change did not lessen the Lavalas supporter's power and diminish his well-founded fear because the Lavalas supporters still controlled and dominated the police and political powers in Haiti, there has been no major change in the police force, and the 2004 Country Report supports his claims. Lordeus also argues that the IJ erred in finding that the inconsistencies in Lordeus's testimony undermined his claim for asylum. Lordeus further claims that the IJ erred in denying his claims for withholding of removal and CAT relief. These claims and arguments were all advanced in his briefs and at oral argument by his counsel.

When the BIA issues a decision, we review only that decision, except to the extent that the BIA expressly adopts the IJ's decision. See Al-Najjar v. Ashcroft,

12

257 F.3d 1262, 1284 (11th Cir. 2001). Since the BIA did not expressly adopt the IJ's opinion, we should review the BIA's decision. See AR at 2–4.

To the extent that the BIA's decision was based on a legal determination, our review is de novo. See Mohammed v. Ashcroft, 261 F.3d 1244, 1247–48 (11th Cir. 2001). The BIA's factual determinations are reviewed under the substantial evidence test. See Forgue v. United States Att'y Gen., 401 F.3d 1282, 1286 (11th Cir. 2005). Under the substantial evidence test, "we cannot find, or consider, facts not raised in the administrative forum, nor can we reweigh the evidence from scratch." Id. We must affirm the BIA's decision if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." Id. (citation omitted). We will only reverse the agency's factual determinations only where the record compels reversal. See Mendoza v. United States Att'y Gen., 327 F.3d 1283, 1287 (11th Cir. 2003). The record is reviewed in the light most favorable to the BIA's decision, and all reasonable inferences are drawn in favor of that decision. See Forgue, 401 F.3d at 1286.

"Any alien who is physically present in the United States or who arrives in the United States . . ., irrespective of such alien's status, may apply for asylum." INA § 209(a)(1); 8 U.S.C. § 1158(a)(1). The Attorney General may grant asylum if an alien is a refugee within the meaning of the INA. See Mejia v. United States Att'y Gen., 498 F.3d 1253, 1256 (11th Cir. 2007). The INA defines "refugee" as:

13

> [A]ny person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). The alien bears the burden of showing "with specific and credible evidence . . . (1) past persecution on account of a statutorily protected ground or (2) a well-founded fear of future persecution on account of a protected ground." Mejia, 498 F.3d at 1256.

We have indicated that "persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation, and that mere harassment does not amount to persecution." Sepulveda v. United States Att'y Gen., 401 F.3d 1226, 1231 (11th Cir. 2005) (quotations omitted); see also Djonda v. United States Att'y Gen., 514 F.3d 1168, 1174 (11th Cir. 2008) (minor beating and brief detention does not constitute persecution). Nonetheless, being shot at constitutes past persecution, even if the attack is unsuccessful. See Sanchez Jimenez v. United States Att'y Gen., 492 F.3d 1223, 1233 (11th Cir. 2007) ("[A]ttempted murder is persecution."); see also Mejia, 498 F.3d at 1257–58 (attempted attacks over 18 months, culminating in roadside assault at gunpoint, resulting in broken nose, constituted persecution). In addition, serious physical

14

injury is not required "where the petitioner demonstrates repeated threats combined with other forms of severe mistreatment." De Santamaria v. U.S. Attorney Gen., 525 F.3d 999, 1009 (11th Cir. 2008) (holding that the record compelled a finding of past persecution because petitioner "suffered the trauma of repeated death threats, two physical attacks, the murder of a family friend, and a kidnaping cut short only by a harrowing escape" over the course of two years); see also Ruiz v. Gonzales, 479 F.3d 762, 766 & n.2 (11th Cir. 2007) (record compelled the conclusion that Ruiz suffered past persecution because it indicated that, over the course of five months, the FARC beat him on two occasions, telephoned threats to him, and held him against his will for 18 days). "We may consider a threatening act against another as evidence that the petitioner suffered persecution where that act concomitantly threatens the petitioner." De Santamaria, 525 F.3d at 1009 n.7.

"To establish asylum based on past persecution, the applicant must prove (1) that she was persecuted, and (2) that the persecution was on account of a protected ground." Silva v. United States Att'y Gen., 448 F.3d 1229, 1236 (11th Cir. 2006) (emphasis added). "In assessing past persecution [this Court is] required to consider the cumulative impact of the mistreatment the petitioner[] suffered." Mejia, 498 F.3d at 1258 (emphasis in original) (citation omitted).

A showing of past persecution creates a rebuttable presumption of a well-founded fear of future persecution. See Sepulveda, 401 F.3d at 1231. That

15

presumption may be rebutted if the government demonstrates by a preponderance of the evidence either that: (1) "[t]here has been a fundamental change in circumstances such that the applicant no longer has a well-founded fear of persecution in the applicant's country of nationality," or (2) "[t]he applicant could avoid future persecution by relocating to another part of the applicant's country of nationality . . . , and under all the circumstances, it would be reasonable to expect the applicant to do so." 8 C.F.R. §§ 208.13(b)(1)(i)(A)-(B), 208.13(b)(1)(ii).

"If the applicant fails to demonstrate past persecution, an applicant may still establish asylum based upon proof of a well-founded fear of <u>future</u> persecution." <u>De Santamaria</u>, 525 F.3d at 1007 (emphasis added) (citing 8 C.F.R. § 208.13(b)(2)). A well-founded fear of future persecution can be established by "specific, detailed facts showing a good reason to fear that he will be singled out for persecution" on account of a protected ground. <u>Ruiz v. United States Att'y Gen.</u>, 440 F.3d 1247, 1258 (11th Cir. 2006) (citation omitted). As an alternative to demonstrating that he would be "singled out for persecution," an alien may show a pattern or practice in the subject country of persecuting members of a statutorily defined group of which the alien is a part. 8 C.F.R. § 208.13(b)(2)(iii). The alien must show that his fear of persecution is "subjectively genuine and objectively reasonable." <u>Ruiz</u>, 440 F.3d at 1257. "The subjective component is generally satisfied by the applicant's credible testimony that he or she genuinely fears

16

persecution. . . . In most cases, the objective prong can be fulfilled either by establishing past persecution or that he or she has a good reason to fear future persecution." Al Najjar, 257 F.3d at 1289 (citation and quotation marks omitted).

In addition, the regulations note:

An applicant does not have a well-founded fear of persecution if the applicant could avoid persecution by relocating to another part of the applicant's country of nationality or, if stateless, another part of the applicant's country of last habitual residence, if under all the circumstances it would be reasonable to expect the applicant to do so.

8 C.F.R. § 208.13(b)(2)(ii); see also Ruiz, 440 F.3d at 1258–59 (adverse-credibility case) (noting that alien's fear of future persecution was undermined because his family remained in the country of origination without persecution); Arboleda v. United States Att'y Gen., 434 F.3d 1220, 1223–24 (11th Cir. 2006) (discussing the codification of the "country-wide" requirement and listing cases); Mazariegos v. Office of United States Att'y Gen., 241 F.3d 1320, 1327 (11th Cir. 2001) (explaining, without addressing the regulation, that, under the "country-wide" requirement, "it is not unreasonable to require a refugee who has an internal resettlement alternative in his own country to . . . establish that such an option is unavailable").

The regulations identify several considerations relevant to whether it would be "reasonable" for an alien to relocate, including:

17

whether the applicant would face other serious harm in the place of suggested relocation; any ongoing civil strife within the country, administrative, economic or judicial infrastructure; geographical limitations; and social and cultural constraints, such as age, gender, health, and social and familial ties.

8 CFR § 208.13(b)(3). "In cases in which the persecutor is a government or is government-sponsored, or the applicant has established persecution in the past, it shall be presumed that internal relocation would not be reasonable." 8 C.F.R. § 208.13(b)(3)(ii).

The burden regarding withholding of removal and CAT relief is higher than the asylum standard. See Forgue, 401 F.3d at 1288 n.4. Thus, a petitioner who fails to establish eligibility for asylum is usually unable to carry the burden regarding withholding of removal and CAT relief. See id.; Al Najjar, 257 F.3d at 1292–93.

Initially, the BIA acknowledged that the IJ made no explicit adverse credibility finding with regard to Lordeus's testimony about the alleged incidents of persecution. AR at 2. Therefore, Lordeus's testimony with regard to the incidents that occurred on 17 December 2003 are accepted as credible. See De Santamaria, 525 F.3d at 1011 n.10 ("Where an IJ fails to explicitly find an applicant's testimony incredible and cogently explain his or her reasons for doing so, [this Court] accept[s] the applicant's testimony as credible.").

18

Viewing the record in the light most favorable to the BIA's decision, and drawing all reasonable inferences in favor of that decision, substantial evidence supports the BIA's determination that Lordeus did not suffer past persecution. See Forgue, 401 F.3d at 1286. Lordeus testified that he and Serge attended a demonstration at the University on 17 December 2003. AR at 311–12. According to Lordeus, the demonstration was broken up by Lavalas supporters who, with the help of the police, threw stones at and beat the demonstrators. Nothing in the record compels a finding that Lordeus was injured at the demonstration. See generally AR. Later that evening, Lavalas supporters broke into Lordeus's home, beat him, hit him in the head with their weapons, slapped his mother, and kidnaped Lordeus and his cousin. Id. at 313–14. Although Lordeus stated in his addendum to his application that he could "still feel the effects of the blows today," there is nothing in the record to compel a finding that Lordeus was injured as a result. Id. at 350; see generally AR. After they beat him, on the same day, the Lavalas supporters took Lordeus to a prison where he was kept for approximately one week. Id. at 314–15. While he was detained, Lordeus and Serge were interrogated. Id. Although Lordeus described an incident that occurred at another university on 5 December 2003, he admitted he was not involved in that demonstration, and, although he stated that a similar demonstration occurred at the University that same day, he also conceded that he was safe inside a classroom at

19

the time of the incident. Id. at 300–01, 309–10. We have held that a kidnaping coupled with beatings before and during the kidnaping, and threatening phone calls, amounted to persecution. See Ruiz, 479 F.3d at 766 n.2. We have also determined that serious physical injury is not necessarily required to establish past persecution. See De Santamaria, 525 F.3d at 1009. However, unlike the series of incidents in Ruiz, which occurred over the course of five months, and unlike the repeated threats in De Santamaria, which occurred over the course of two years, the events in the instant case, which all originated on 17 December 2003, lasted only five days. See id.; Ruiz, 479 F.3d at 763–64. Thus, even though he was not necessarily required to show that he was seriously injured, Lordeus has failed to demonstrate "repeated threats combined with other forms of severe mistreatment." See De Santamaria, 525 F.3d at 1009. Therefore, the record does not compel reversal of the BIA's finding that Lordeus did not suffer past persecution. See Mendoza, 327 F.3d at 1287.

Further, substantial evidence supports the BIA's determination that Lordeus failed to demonstrate a well-founded fear of future persecution. As previously discussed, he failed to establish past persecution, so there is no presumption of future persecution. See Sepulveda, 401 F.3d at 1231. Lordeus argues that he established a pattern or practice in Haiti of the Lavalas supporters persecuting students. However, the 2004 Country Report indicates that, while instability

20

continued in Haiti, the government was no longer substantially controlled by the Lavalas Party. AR at 392. Next, Lordeus maintains that, even after Aristide's departure, the Lavalas supporters still controlled the police force. However, the 2004 Report indicates that the interim government had begun inducting new recruits, and the United Nations established a civilian police force in order to support the national police. Id. at 396. Moreover, although the Lavalas supporters continued to wreak havoc in Haiti, particularly in Port-au-Prince, the anti-Aristide rebels and the interim government police had begun taking control back of many of the areas of central Port-au-Prince as well as the countryside, and there many reports of arrests of pro-Lavalas supporters and activists. Id. at 397, 399–401. Because substantial evidence supports the conclusion that the Lavalas Party is not in control of either the government or the police force, Lordeus was not entitled to a presumption that relocation would not be reasonable. See 8 C.F.R. § 208.13(b)(3)(ii). As such, Lordeus's objective fear is undermined because the record reflects that Lordeus's parents and three sisters, including Kathleen, who was admitted to the University in September 2004, continue to reside in Haiti. See Ruiz, 440 F.3d at 1259; AR at 294–95, 356. Significantly, even Serge, whom Lordeus testified was shot and persecuted by the Lavalas supporters shortly after Aristide left office, remained in Port-au-Prince. AR at 319. Thus, although Lordeus may subjectively fear future persecution, substantial evidence supports a

21

conclusion that his fear is not objectively reasonable.  See Ruiz, 440 F.3d at 1257.

Accordingly, the record does not compel a reversal of the BIA's finding that

Lordeus did not have a well-founded fear of future persecution by the Lavalas

supporters.  See Mendoza, 327 F.3d at 1287.

### III.  CONCLUSION

Therefore, Lordeus fails to establish a claim for asylum on the merits.  As

such, he also fails to establish eligibility for withholding of removal and CAT

relief.  See Forgue, 401 F.3d at 1288 n.4.  Accordingly, we **DENY** Lordeus's

petition for review.