[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 22, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-11275

_____

BIA No. A97-196-333

TCHILABALO DJONDA,

Petitioner,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

**(January 22, 2008)**

Before BLACK and PRYOR, Circuit Judges, and LIMBAUGH,[*] District Judge.

PRYOR, Circuit Judge:

---

[*]Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri, sitting by designation.

We sua sponte vacate and reconsider our original opinion and substitute the following.

The two issues in this appeal are whether substantial evidence supports the findings of the Board of Immigration Appeals that Tchilabalo Djonda, a native and citizen of Togo, suffered a minor beating and brief detention, while in Togo, that did not amount to persecution, and whether Djonda is not likely to face more severe treatment there upon his return. Djonda petitions for review of a decision of the Board that affirmed an Immigration Judge's denial of Djonda's application for asylum, 8 U.S.C. § 1158(a)(1); withholding of removal, 8 U.S.C. § 1231(b)(3); and relief under the United Nations Convention Against Torture. Djonda was detained for 36 hours and beaten by Togolese police for participating in a political rally. Medical records state that he suffered scratches and muscle bruises. A year later, Djonda received a summons to appear at a police station, where he believed he would be detained indefinitely and possibly killed. Djonda fled Togo rather than appear at the police station. Because the record does not compel a finding that Djonda suffered persecution or has a well-founded fear of persecution upon his return, we deny Djonda's petition.

## I. BACKGROUND

2

Djonda entered the United States as a nonimmigrant student on January 9, 2003. After he arrived, he filed an application for asylum and withholding of removal on the ground that he suffered persecution in Togo on account of his political opinion and had a well-founded fear of future persecution. On September 25, 2003, Djonda was served with a Notice to Appear and charged with removability based on a failure to maintain his status as a student visitor. Djonda appeared and testified at a hearing before the Immigration Judge on September 30, 2004.

Before entering the United States, Djonda was a student in Togo at the University of Lome, which was operated by the government. In 2000 he joined the Union des Forces de Changement, an opposition political party in Togo. He also belonged to the Conseil des Etudiantes de l'Universite de Lome, a student organization sympathetic to the Union but not formally associated with it.

On the night of December 17, 2001, Djonda was arrested for participating in a meeting of the Conseil at his university. On the way to the police station, the police discovered Djonda's documents of membership in the Union and beat him. Police officers asked Djonda why he would not support a president who was a member of the same tribe as Djonda.

When Djonda arrived at the police station, he was ordered to disrobe and was beaten with a belt and kicked. He was separated from the other Conseil members who had been arrested, and he spent the night in a small cell with 12 other people where he was unable to sleep. A policeman later asked Djonda if he was hungry, and when Djonda replied that he was, the policeman forced Djonda to drink some very dirty liquid and to eat something "very, very, very bad." A superior officer told Djonda that it was treason for Djonda to oppose a president from his own tribe and forced Djonda to sign a document declaring that the Conseil was financed by the Union to create trouble. After he signed the paper, Djonda was told that the next time he was arrested he "was going to rot in jail" and the declaration Djonda signed would be used as evidence against him.

Approximately 36 hours after his arrest, Djonda was released. Djonda's brother took him to the hospital, where he stayed for two days. The medical records from this stay stated that Djonda was "covered with blood" when he arrived at the clinic. Djonda had multiple scratches, mostly around his neck and knees, and multiple muscle bruises, but x-rays revealed no damage to his vertebral column or skull. The doctor concluded Djonda needed to rest for two weeks and prescribed him several medications. Over the course of the next year, Djonda

4

continued to attend Union and Conseil meetings but refrained from participating in big demonstrations, where many arrests were made.

Two of Djonda's brothers were active in politics, and both were targeted by the ruling party. At the time of Djonda's hearing before the Immigration Judge, Djonda's older brother, Abalo, was in hiding somewhere near the Togo-Benin border. A second older brother, Tchiao, was a member of the Executive Board of the Union in Kara, Togo. On January 4, 2003, Tchiao was arrested in the northern part of Togo by the eldest son of the president. At the time of his hearing, Djonda and his family had not heard from Tchiao and did not know where Tchiao was, although they believed he was either still in prison or had been killed.

Two days after Tchiao's arrest, two members of a student group loyal to the president told Djonda that they knew Tchiao had been arrested and imprisoned two days earlier and that Djonda would follow his brother to prison. Djonda took this threat seriously because it was not yet public knowledge that Tchiao had been arrested, which suggested that the students acquired their knowledge through government channels. On January 7, Djonda received a summons to appear at the police station the next day as part of an investigation. Individuals who had received such invitations were being detained upon arriving at the police station.

Djonda's uncle called a friend of his who was a policeman and told him Djonda had received a summons, had been previously detained by the police, and was forced to sign the declaration stating that the Conseil was funded by the Union. The friend said that those responding to the invitations were being detained and, because Djonda had signed the declaration the first time he was detained, "it would not be advisable for [him] to go [to the police station]. There would be consequences."

The day before Djonda received the summons, he had acquired a student visa to study in the United States. After Djonda's uncle talked with his friend at the police station, Djonda and his uncle decided that Djonda should leave for the United States immediately, instead of when Djonda had intended to leave. Djonda's uncle owned a travel agency and arranged a flight out of Togo for the following day, January 8. The policeman-friend of the family stamped Djonda's passport so that Djonda would not have to interact with the authorities, and Djonda arrived in Atlanta on January 9.

Soon after Djonda arrived in the United States, another summons to the police station arrived at his house in Togo. On January 20, his uncle was summoned to the police station and held for several hours to answer questions about Djonda's whereabouts. The police said they would find Djonda and that,

6

when they did, they would imprison him. Djonda's uncle was later interrogated two more times about Djonda's whereabouts.

The next month, in February 2003, Djonda's uncle was involved in a mysterious car accident when a large truck that had been following his car for some time suddenly hit his car and drove away. The uncle suffered a broken leg and spent a month in the hospital as a result of the crash. The harassment suffered by Djonda's uncle made it difficult for him to fund Djonda's education abroad, and eventually Djonda was unable to maintain his status as a student.

In addition to his medical records, Djonda presented other documentary evidence in support of his claims. A sworn statement from his brother, Abalo, recounted how Abalo had been targeted by the Togolese police and was in hiding. This statement also asserted that a classmate of Djonda who had fled to Ghana was arrested when he returned to visit his family. An email from Djonda's younger brother dated April 24, 2004, stated that Djonda's family still hadn't heard from Tchiao and "believe[d] that he [wa]s still jailed in the camp Landja of Kara." This email also stated that Abalo recently had visited for thirty minutes before heading for Benin. A sworn statement from Djonda's uncle dated May 1, 2004, stated, "A member of our family is actually in jail and we have not heard from him for a long time," and that the uncle had been "under constant menace" since Djonda fled. An

7

email from a friend of Djonda dated March 31, 2004, read in part, "The students' situation is becoming worse and worse . . . . I think that you and the ones who fled were lucky to leave when you did. I am sure you don't think of coming back here because everybody who returned are declared not found or found dead in the streets." Finally, Djonda submitted various State Department Country Reports and Amnesty International publications about the general country conditions in Togo.

The Immigration Judge denied Djonda's application for asylum. The Immigration Judge concluded that Djonda's single detention did not amount to past persecution. He also concluded that Djonda failed to present documentation that adequately supported, and was consistent with, his oral testimony concerning a well-founded fear of future persecution. Because Djonda failed to establish eligibility for asylum, the Immigration Judge found him ineligible for withholding of removal and relief under the Convention Against Torture.

On appeal, the Board of Immigration Appeals affirmed the decision of the Immigration Judge but disagreed with some of his findings. The Board found that Djonda "not only testified credibly, but also submitted numerous documents corroborating the general background information and specifics of his claim." The Board concluded, however, that Djonda had not suffered past persecution because his detention was brief and he only suffered minor scratches and bruises. With

respect to Djonda's fear of future persecution, the Board concluded that, although the 2003 Country Report said Union members are frequently arrested and Djonda established he would likely face arrest or detention upon his return, his treatment was not likely to rise to the level of persecution because Union members are typically released within days. The Board found particularly informative a section of the report that stated that, in March 2003, Union members arrested at a weekly meeting were detained for only two days and were not subjected to physical abuse. The Board concluded that Djonda failed to establish his eligibility for asylum and for withholding of removal.

## II. STANDARD OF REVIEW

"This court reviews administrative fact findings under the highly deferential substantial evidence test. Under the substantial evidence test, we view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." Adefemi v. Ashcroft, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc) (citations omitted).

## III. DISCUSSION

Our discussion is divided into two parts. First, we discuss Djonda's argument that he suffered past persecution. Second, we examine Djonda's contention that he will be persecuted if returned to Togo. Djonda makes no

9

arguments on appeal that he is entitled to relief under the Convention Against Torture, and "[w]hen an appellant fails to offer argument on an issue, that issue is abandoned." Sepulveda v. U.S. Att'y Gen., 401 F.3d 1226, 1228 n.2 (11th Cir. 2005); see also Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989).

### A. The Record Does Not Compel the Conclusion That Djonda Suffered Persecution in Togo.

Djonda first contends that the Board erred when it concluded he did not suffer persecution in Togo. Although Djonda maintains that beatings need not be serious or result in permanent injury to constitute persecution, he does not dispute the conclusion of the Board that minor beatings and brief detentions do not amount to persecution. He maintains instead that the beating he suffered was severe and that verbal threats alone can amount to persecution. These arguments fail.

Whether Djonda suffered a minor beating is a factual question, which we review for substantial evidence. The Board based its finding on Djonda's medical documents, which stated that he suffered only "scratches and bruises." These documents constitute substantial evidence in favor of the finding of the Board.

10

Djonda argues that even if his beating was not severe, he still suffered persecution because he was told by two students loyal to the president that he would be arrested, and verbal threats can amount to persecution. Djonda cites Bellido v. Ashcroft, 367 F.3d 840, 846 (8th Cir. 2004), and Corado v. Ashcroft, 384 F.3d 945, 947 (8th Cir. 2004), for this proposition. We disagree with Djonda's reading of the record.

Djonda's argument fails for at least two reasons. First, even if we were to presume that the communication by the students constituted a threat, we would deny relief because we have previously held that threats more extensive than this one did not constitute persecution. See Sepulveda, 401 F.3d at 1231. The threats viewed in conjunction with the minor beating would not compel the conclusion that Djonda suffered persecution. Second, the students who told Djonda he would be jailed were not individuals who had the power to make good on the "threat" they conveyed. "[V]iew[ed] . . . in the light most favorable to the agency's decision," Adefemi, 386 F.3d at 1027, the communication by the students to Djonda was not a threat, but a prediction or warning. The record does not compel the conclusion that Djonda suffered past persecution.

> *B. The Record Does Not Compel the Conclusion That Djonda Has a Well-Founded Fear of Persecution Should He Be Returned to Togo.*

11

Djonda next argues that the Board erred when it found that he does not have a well-founded fear of persecution in Togo. In the asylum context, an applicant establishes a well-founded fear when he establishes that there is "a reasonable possibility he or she would be singled out individually for persecution," or that he is a member of, or is identified with, a group that is subjected to a pattern or practice of persecution. 8 C.F.R. § 208.13(b)(2)(iii). Djonda presents six pieces of evidence that he will be subjected to persecutory treatment if returned to Togo: (1) his brother Tchiao had not been heard from more than a year after he was imprisoned by the government, and his brother Abalo went into hiding; (2) students loyal to the government predicted, the day before Djonda received his summons, that Djonda would be jailed like his brother; (3) the day after this prediction, Djonda received a summons to appear at the police station; (4) the policeman-friend of his uncle warned him that it would be bad for him to answer the summons; (5) Djonda's uncle was mistreated after he left; and (6) others who have fled Togo and returned have been imprisoned or killed. The Board found that Djonda had not established a reasonable possibility that he would be subjected to treatment worse than what he had previously experienced, and substantial evidence supports that finding.

12

We do not deny that Djonda's evidence might allow a reasonable factfinder to find that he will be persecuted upon his return to Togo, but "[o]ur review is more limited." Silva v. U.S. Att'y Gen., 448 F.3d 1229, 1237 (11th Cir. 2006). When reviewing for substantial evidence, we do not ask whether the evidence presented by an applicant might support a claim for relief; instead, we ask whether the record compels us to reverse the finding to the contrary. Id.; 8 U.S.C. § 1252(b)(4)(B). Although the record evidence suggests that Djonda will be detained upon his return, it does not compel the conclusion that Djonda has a well-founded fear that his treatment will rise to the level of persecution.

The Board was entitled to find one part of the record to be especially relevant to Djonda's application. The 2003 State Department Report on Togo corroborates that, although Union members are frequently arrested, they are typically not subjected to harsh treatment. The Board relied on a passage from this Report that recounted how Union members who were arrested while attending a weekly meeting were detained for two days but were not physically harmed. We have stated that the Board is "entitled to rely heavily on" country reports, Reyes-Sanchez v. U.S. Att'y Gen., 369 F.3d 1239, 1243 (11th Cir. 2004) (citing Rojas v. INS, 937 F.2d 186, 190 n.1 (5th Cir. 1991) ("[The State Department] is the most appropriate and perhaps best resource the Board could look to in order to obtain

13

information on political situations in foreign nations."")), and the substantial evidence test does not allow us to "reweigh . . . from scratch" the importance to be placed on the 2003 Report, Mazariegos v. U.S. Att'y Gen., 241 F.3d 1320, 1323 (11th Cir. 2001).

The evidence presented by Djonda is not the kind of evidence that calls into question the reliance of the Board upon the 2003 Report. Because we are reviewing for substantial evidence, we must draw all inferences from Djonda's evidence in favor of the decision of the Board. Adefemi, 386 F.3d at 1027. Viewed in this manner, Djonda's evidence does not compel the conclusion that Djonda has a well-founded fear that he will suffer an extended detention or harsh physical treatment.

Djonda's evidence that his brothers have been mistreated by the government for their political activities is equivocal. Tchiao was imprisoned on January 4, 2003, and had not been heard from as of April 24, 2004. Djonda infers from this silence that Tchiao was either imprisoned this entire time or killed, and that he himself would suffer a similar fate. Although a sworn statement from Djonda's uncle states that "[a] member of our family is actually in jail," Djonda testified that "we don't know where he is" and stated in his written application that his family "believes [Tchiao was] taken to Camp Landja." An email from

14

Djonda's younger brother similarly states only that he "believe[d] that [Tchiao] [wa]s still jailed." A factfinder could reasonably interpret the more definite statement of Djonda's uncle in the light of the qualifying statements of Djonda himself and Djonda's younger brother.

The evidence concerning Djonda's other brother, Abalo, is similarly indefinite. Abalo went into hiding along the Togo-Benin border after being harassed by the government, but there is no evidence that Abalo fled because he had been subjected to, or believed he would be subjected to, harsh treatment rising to the level of persecution. A factfinder could reasonably infer that Abalo had fled because he was subjected to or believed he would be subjected to the type of unpleasant, but not persecutory, treatment endured by Djonda.

Even if we were to infer that Djonda's brothers were persecuted, we would still deny Djonda relief because the record does not compel the conclusion that Djonda has a well-founded fear that he will be treated like his brothers. Djonda infers from some of his evidence—the prediction by his fellow students that he will be imprisoned like Tchiao, the summons he then received, and the concern of his uncle's policeman-friend—that he will be treated like Tchiao and subjected to the kind of harsh treatment he believes Tchiao to have endured, but this evidence does not compel the conclusion that Djonda has a well-founded fear of such

15

treatment. Djonda's fellow students did not predict that Djonda would be imprisoned for a long period of time, and Djonda does not know Tchiao's whereabouts. Tchiao also occupied a prominent leadership position within the Union, in contrast with Djonda, who not only did not occupy a leadership position, but had not participated in any large demonstrations in the year between his detention and his flight from Togo.

Djonda's later receipt of the summons and the concern expressed by his uncle's policeman-friend similarly fail to establish that Djonda will necessarily be imprisoned for an extended period upon his return. The policeman-friend stated only that "it would not be advisable" for Djonda to respond to the summons and "[t]here would be consequences." These statements would be equally true if Djonda were expected to suffer another two-day detention and a minor beating, which the Board thought more likely to happen.

None of the evidence of mistreatment of Djonda's uncle compels the conclusion that Djonda has a well-founded fear that he will be persecuted upon his return. Djonda's uncle was interrogated about Djonda's whereabouts and told that Djonda would be imprisoned when he was found. As was the case with Djonda's fellow students, there is no evidence that Djonda's uncle was told by the government that Djonda would be imprisoned for an extended period of time. A

16

factfinder could reasonably infer that any threatened detention would be brief, as it was before. Djonda's uncle was also involved in a mysterious car accident that Djonda implies was caused by the government, but Djonda does not state either that he knew or even that he believed the government to have been involved.

Djonda's remaining evidence consists of documentation he submitted that purports to establish that students and others who flee the country for political reasons and return are either killed or disappear, but this evidence does not compel a finding that Djonda has a well-founded fear that he will be persecuted. In his sworn affidavit, Abalo recounted how a classmate of Djonda who fled to Ghana was arrested when he returned to visit his family, but that statement is silent about whether the classmate was imprisoned for an extended period or was subjected to harsh physical abuse. A friend of Djonda stated in an email that "[t]he students' situation is becoming worse" and "everybody who returned [after fleeing the country] are declared not found or found dead in the streets," but the record contains no evidence about the background or qualifications of the individual who made this statement. There is no reason to think the statement is based on comprehensive knowledge of the treatment by the government of fugitives as opposed to the speculation of Djonda's friend. The Board was entitled to find that the 2003 Report was more indicative of the kind of treatment Djonda could expect

17

to receive upon his return.

The record does not compel the conclusion that Djonda established a reasonable possibility that he will be persecuted upon his return to Togo, so we deny his petition for asylum based on a well-founded fear of persecution. Because Djonda has failed to establish his eligibility for asylum, he has necessarily failed to meet the higher standard for withholding of removal. Silva, 448 F.3d at 1243. We deny Djonda's petition for withholding of removal as well.

## IV. CONCLUSION

Djonda's petition for review is

**DENIED.**