[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-10711

_____

Agency No. A088-023-457


CHE ERIC SAMA,

                                                                Petitioner,

versus

U.S. ATTORNEY GENERAL,

                                                                Respondent.


_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(April 19, 2018)

Before WILLIAM PRYOR and JULIE CARNES, Circuit Judges, and ANTOON,[*]
District Judge.

WILLIAM PRYOR, Circuit Judge:

_____

[*] Honorable John Antoon II, United States District Judge for the Middle District of
Florida, sitting by designation.

This petition for review requires us to decide whether substantial evidence supports the decision of the Board of Immigration Appeals that Che Eric Sama did not suffer past persecution by the Cameroonian police and that he lacked a well-founded fear of future persecution. Sama, a native and citizen of Cameroon, filed the petition to review the denial of his applications for asylum, 8 U.S.C. § 1158, and for withholding of removal under the Immigration and Nationality Act, *id.*§ 1231(b)(3), and under the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, 8 C.F.R. § 208.16. Sama contends that the record compels findings that he suffered persecution and that he had a well-founded fear of being singled out for future persecution for associating with two gay friends and posting a message in a university publication condemning the treatment of gay individuals. But we disagree. The Board was entitled to find that any mistreatment that Sama suffered did not rise to the level of persecution, to find that the police investigated his mistreatment, and to rely on country reports published by the State Department that state that conditions in Cameroon are improving for gay individuals. Sama also argues that the Board denied him due process when it weighed his evidence. But due process required only notice and an opportunity to be heard, and Sama received both. We deny Sama's petition for review.

2

## I. BACKGROUND

This appeal arises from Che Eric Sama's most recent attempt to enter the United States. He testified that he has applied for various kinds of visas "about five times" and that he "was banned from applying again" because he submitted a bank statement that "was not original." This time, he came to the United States seeking asylum, 8 U.S.C. § 1158, and withholding of removal under the Immigration and Nationality Act, 8 U.S.C. § 1231(b)(3), and the United Nations Convention Against Torture and Other Cruel, Inhuman and Degrading Treatment or Punishment, 8 C.F.R. § 208.16, after a friend in Nigeria told him that he "could get out of the country and apply for asylum where [he] w[ould] be safe."

In 2015, Sama posted a message in a university publication in Cameroon "supporting homosexuality and asking for equal rights for homosexuals." He testified that he protested the expulsion of two friends, Fai David and David's partner, and wrote: "They kick them out and they are all created by God. Why, why don't you allow their rights?" In response, the police issued a warrant for Sama's arrest that charged him with "[t]he posting of an article on [g]ay right[s] on the [s]chool [b]oard" and "[c]arrying out [h]omosexual [a]ctivities."

According to Sama, an "anti-gay group" attacked him at the end of November because he posted "homosexual things." While he was walking home after class, four men pushed him to the ground, "cut [his] neck," and warned him

3

that he "should stop [his] homosexual activities." The men told him that, "if [he] d[id] [not] stop . . ., they [we]re going to kill [him] next time they s[aw] [him.]"

Fellow students secured transportation for Sama to a hospital, where he was treated for "[w]ounds and a big cut on [his] neck," a "[h]ead ache and [s]wollen face," "[s]erious[] [b]leeding," and other symptoms of an "assault." While he was being treated, the hospital called the police, who came to the hospital and took a statement from Sama about the attack. Although the warrant for his arrest remained outstanding, the police did not arrest him then. But his attackers were never found, which led Sama to conclude in his application for asylum that "[no] investigation was done."

On November 25, 2015, the hospital discharged Sama, and he went to live with his cousin "on the outskirts" of town. On December 6, he returned to his mother's house to retrieve some belongings. While he was collecting his things, an unknown individual threw a brick through the window of his room. The brick was inscribed with the message "we don't want gays in our community." Sama did not testify that he reported this incident to the police.

Two days later, the police attempted to execute the warrant for his arrest at his mother's house. When his mother refused to tell the police where Sama was, they arrested and detained her. She was released after "about two days."

4

At some point, news sources reported that David was murdered. According to the news, the police were "making no efforts to find his killers." And Sama speculated that David's partner might have been kidnapped and that "he or his body has not been found."

On December 7, Sama began his journey to the United States. He first flew to Nigeria, but he left after a friend warned him that he would not be safe there. Sama then traveled to Mexico, where his passport was stolen, and took a bus and a taxi to the United States border. The Department of Homeland Security charged Sama as an alien seeking admission without a valid entry document, *see* 8 U.S.C. § 1182(a)(7)(A)(i)(I), and Sama sought asylum.

At his removal hearing, Sama introduced evidence to support his claims of persecution. He testified that he left Cameroon because his "life was in danger." He stated that "[t]he police were looking for [him] and the anti-gay group wanted to kill [him] and [he] was not safe at all." He also explained that "homosexuals are treated badly," "are not recognized by the community," and "are perceived as evil" in Cameroon. And Sama testified that he is not gay but that he was perceived as gay in Cameroon because of his post and his friendships.

He submitted statements from his friends and family. Nubende Pual, a fellow student, stated that "[t]he popular theory going around the school campus [wa]s that [Sama] was attacked because he was friendly to homosexuals and had

5

publicize[d] comments that were homosexual friendly." He stated that "[b]eing homosexual or supporting homosexuals in Cameroon is a taboo that is highly punishable by law enforcement agents and antigay groups." Sama's cousin, Bangeng Gideon Sama, declared that Sama had "been warned against returning . . . because of the significant likelihood that he will be arrested and tortured to dea[th] because of the previous incident and his belie[f]s." Another classmate of Sama's, Nutella Nelda, recounted visiting him in the hospital, where Sama told her and her boyfriend that his attackers asked why he posted the message in the university publication. Nelda also stated that Sama told them that he could not report the incident to the police because they were looking for him. And she stated that "because the police are . . . searching for him and the anti gay/lesbian mob is still at-large, [and] there is a very high possibility that if [Sama] return[s] to Cameroon he will be hurt again and possibly kill[ed]." Her boyfriend submitted a similar declaration. And Sama's uncle, Che Godlove, stated that he "believe[s] [Sama] can't come back to Cameroon because the authority, anti-gay [*sic*] are presently looking for him."

Sama also submitted several documents, including two newspaper articles and country reports by the Department of State and Amnesty International. A 2013 State Department report stated that consensual homosexual activity is illegal and punishable by a prison sentence of six months to five years and a fine between $41

6

and $410 in American dollars. The report explains that, before 2013, the police "actively enforced the law and arrested, tried, jailed, and beat alleged [lesbian, gay, bisexual, and transgender] individuals," and police officers "cooperated with vigilante groups to entrap and arrest them." According to the report, lesbian, gay, bisexual, and transgender individuals "regularly faced social stigmatization and mob violence, which sometimes resulted in their deaths."

More recent reports explain that the situation in Cameroon is improving for gay individuals. For example, the 2015 State Department report concluded that "[h]arassment of and discrimination against members of the lesbian, gay, bisexual, transgender, and intersex . . . community" was "less than in recent years," although the report found that it still "continued." Same-sex sexual activity remained illegal, but "reports of arrests dropped dramatically," and human rights organizations were advocating for decriminalization as well as defending those prosecuted. The report also stated that "[u]nlike in previous years, there were few reports that [lesbian, gay, bisexual, transgender, and intersex] individuals who sought protection from authorities were extorted or arrested." And the report described an instance in which "[a] passing law enforcement officer rescued" a "transvestite individual" from a group of assailants "us[ing] sticks and stones to beat her."

After reviewing this and other evidence, the immigration judge ruled that Sama was not "eligible for the relief of asylum" and that, because he relied on the

same evidence to support his claims for withholding of removal and protection under the Convention, Sama was also not eligible for those forms of relief. Although the immigration judge ruled that Sama was credible, she found that he failed to prove past persecution. She found that Sama had not established that he had been persecuted by the Cameroonian government or that the government was "unwilling or unable to protect him." She found that the police took his statement about the street assault and that "the failure by the police to arrest [his attackers] does not indicate that the police failed to investigate." She found "no indication that the police made any comment to [Sama] indicating that they would not investigate his claim, as opposed to having insufficient evidence to locate the perpetrators." The immigration judge also found that Sama never reported the vandalism to his mother's house and that there was no indication that the vandalism was "officially sponsored."

The immigration judge also found that Sama failed to establish a well-founded fear of future persecution. She found that "[w]hile the record suggests [that] the group that attacked [Sama] remains at large, there is no convincing evidence that any private citizens have continued searching for [Sama], or even if they are, that the police cannot or will not protect him as they did in the past." She acknowledged that a warrant for his arrest was issued in 2015, that his mother was detained for two days because she refused to tell the police where Sama was, and

8

that Sama's friends and relatives expressed concern for him. But she found that "no Cameroonian authorities ever stopped or arrested [Sama]"—even though the police took his statement at the hospital after the warrant issued. Indeed, the police never "returned [to] the hospital to search for [Sama] or seek to arrest him" during his 15-day convalescence despite the close proximity of the hospital to the "region . . . where the warrant was issued." In addition, the immigration judge found that the 2015 State Department report evidences that "Cameroonian authorities are willing and able to protect [lesbian, gay, bisexual, transgender, and intersex] persons and their allies." In sum, Sama "ha[d] not shown that he has an objectively reasonable fear of persecution in Cameroon." So the immigration judge ruled that Sama did not qualify for asylum or any other form of relief.

The Board of Immigration Appeals dismissed Sama's appeal. It agreed with the immigration judge that Sama failed to prove that he had been persecuted or had a well-founded fear of "future harm in Cameroon on account of [his] support of, or association with, homosexuals . . . carried out by groups or individuals the government of Cameroon is unable or unwilling to control." The Board found it persuasive that the police "came to take [Sama's] statement when called by hospital personnel" and that the officers did not take advantage of the opportunity to arrest him. It also relied on the 2015 country report, which "discusse[d] an incident in which police came to the aid of a member of the [lesbian, gay, bisexual,

9

transgender, and intersex] community." And it relied on the immigration judge's conclusion that, although "homophobia is pervasive in Cameroon, incidents of arrest and extortion by [the] authorities [a]re decreasing."

## II. STANDARD OF REVIEW

We review the decision of the Board. *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 947–48 (11th Cir. 2010). We review legal conclusions *de novo*, but our review of the factual findings is "limited" by "the highly deferential substantial evidence test." *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236–37 (11th Cir. 2006). "[W]e must affirm if the decision of the [Board] is 'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" *Id.* at 1237 (*Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1230 (11th Cir. 2005)). "We view the record evidence in the light most favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* at 1236 (alteration adopted) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (en banc)). "[W]e may not reweigh the evidence from scratch," and we may reverse "only when the record compels a reversal." *Id.* (citations and internal quotation marks omitted).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that substantial evidence supports the finding of the Board that Sama was not eligible for asylum

10

and, as a result, that he was not entitled to withholding of removal or relief under the Convention. Second, we explain that Sama received due process of law.

### A. Substantial Evidence Supports the Decision of the Board that Sama Was Not Eligible for Asylum.

Sama argues that he is eligible for asylum because the record compels a finding that he both experienced past persecution and has a well-founded fear of future persecution. "To establish asylum eligibility based on . . . [a] protected ground, the alien must, with credible evidence, establish (1) past persecution on account of . . . [a] protected ground, or (2) a 'well-founded fear' that . . . [a] protected ground will cause future persecution." *Sepulveda*, 401 F.3d at 1230–31 (quoting 8 C.F.R. § 208.13(a), (b)). The applicant must also link that persecution to the government by showing that the persecution is either "by government forces" or "by non-government groups that the government cannot control." *Ayala*, 605 F.3d at 948 (quoting *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1257 (11th Cir. 2006)).

We reject Sama's arguments. Substantial evidence supports the findings of the Board that Sama did not experience past persecution and does not have a well-founded fear of future persecution. And because he is not eligible for asylum, he is necessarily not entitled to withholding of removal or relief under the Convention. *See Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1292 (11th Cir. 2006). We address each argument in turn.

11

1.  Substantial Evidence Supports the Finding that Sama Did Not Suffer Past Persecution.

Sama argues that he was persecuted on account of two protected grounds. It is undisputed that Sama expressed a political opinion and is an imputed member of a protected group—namely, the gay community—because others allegedly perceive him to be gay. *See Al Najjar v. U.S. Att'y Gen.*, 257 F.3d 1262, 1289 (11th Cir. 2001) (explaining that an imputed characteristic, "whether correctly or incorrectly attributed, may constitute a ground for a well-founded fear of . . . persecution" (citation and internal quotation marks omitted)). But the parties dispute whether substantial evidence supports the finding that he did not experience persecution by the police.

The record does not compel a finding of past persecution by the police. "[P]ersecution is an extreme concept" that requires evidence of "more than a few isolated incidents of . . . harassment or intimidation." *Sepulveda*, 401 F.3d at 1231 (citation and internal quotation marks omitted). Sama never alleged that he was physically harmed by the police. Indeed, the police expressed an interest in bringing Sama's attackers to justice when they visited the hospital to take his statement about the attack. And Sama has not suggested that he was afraid to speak with the officers at the hospital. True, the police issued a warrant for his arrest because of the message he posted at his school, and they detained his mother on the basis of that warrant. But the warrant issued before he was attacked, the police

12

did not execute the warrant when they visited him at the hospital, and the police released his mother after "about two days" without demanding Sama's surrender. Sama admitted that the police never questioned him about his sexuality or support for gay rights, that he has never been arrested or questioned by the Cameroonian police for any reason, and that he has never spent any time in a Cameroonian jail. These incidents do not amount to "more than a few isolated incidents of . . . harassment or intimidation." *Id.* at 1231 (citation and internal quotation marks omitted). This evidence does not "*compel*[] a reversal." *Silva*, 448 F.3d at 1236 (emphasis added) (quoting *Adefemi v. Ashcroft*, 386 F.3d 1022, 1026 (11th Cir. 2004)).

2. Substantial Evidence Supports the Finding that Sama Does Not Have a Well-Founded Fear of Future Persecution.

Sama also contends that he established a well-founded fear of future persecution. An applicant alleging fear of future persecution bears the burden of proving "(1) 'a subjectively genuine and objectively reasonable' fear of persecution that is (2) on account of a protected ground." *Id.* (internal citation and quotation marks omitted). Although Sama's "credible testimony that he . . . genuinely fears persecution" was sufficient to satisfy the subjective component of the standard, he also had to establish that his fear was "objectively reasonable." *Al Najjar*, 257 F.3d at 1289. And he had to "establish a nexus between a statutorily protected ground and the feared persecution." *Mehmeti v. U.S. Att'y Gen.*, 572 F.3d

13

1196, 1200 (11th Cir. 2009). He could satisfy his burden "by presenting 'specific, detailed facts showing a good reason to fear that he . . . will be *singled out* for persecution on account of' [a protected] ground," *id.* (quoting *Sepulveda*, 401 F.3d at 1231), or that there exists "a pattern or practice of persecution of a group of which he is a member," *id.*

Substantial evidence supports the finding that Sama lacked a well-founded fear of future persecution by the Cameroonian police. Sama argues that the police still have a warrant for his arrest, but the record does not compel a finding that he will be arrested when he returns to Cameroon. To be sure, the police attempted to execute the warrant and arrested Sama's mother shortly before he left the country. But the police did not attempt to arrest Sama when they visited him in the hospital or at any other point during his 15-day convalescence. Sama also points to statements from his friends and family that they believe he faces a continued threat of persecution by the police. For example, his cousin stated that he "believe[s] [Sama] can't go back to Cameroon because [the cousin] ha[d] talk[ed] to friends and family members," who told him that the police "[we]re still looking for [Sama.]" And Sama's uncle similarly stated that he "believe[d]" the police were "looking for" Sama. But the speculative beliefs of Sama's friends and family do not "necessarily" establish that he will be persecuted upon his return. *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1176 (11th Cir. 2008). And even if the record

14

"suggests that [an applicant] will be detained upon his return, it does not compel the conclusion that [he] has a well-founded fear that his treatment will rise to the level of persecution." *Id.* at 1175; *see also Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009) (discussing mistreatment that does not amount to persecution and explaining that we have "ruled that evidence that an alien [who] had been detained for five days, forced to watch reeducation videos, [forced to] stand in the sun for two hours, and [required to] sign a pledge to no longer practice his religion . . . did not compel a finding that the alien had been persecuted").

Sama argues that he introduced evidence that established that "Cameroonian authorities persecute [gay] activists and look away when they are persecuted, attacked, or even killed," but recent country reports explain that conditions are improving. And "the Board is 'entitled to rely heavily on' country reports." *Djonda*, 514 F.3d at 1175 (quoting *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004)). The 2015 State Department report explained that "reports of arrests [of lesbian, gay, bisexual, transgender, and intersex individuals have] dropped dramatically," and that, "[u]nlike in previous years, there were few reports that [lesbian, gay, bisexual, transgender, and intersex] individuals who sought protection from authorities were extorted or arrested." The 2015 report also described the rescue of a transvestite individual by a passing law enforcement officer. And that report explained that human rights and health organizations

15

advocated on behalf of lesbian, gay, bisexual, transgender, and intersex Cameroonians. Although "the inferences [Sama] draws from h[is] version of events [may be] reasonable," *Silva*, 448 F.3d at 1237, the record does not "compel[]," *id.* at 1236 (quoting *Adefemi*, 386 F.3d at 1027), the conclusion that Sama will be singled out for persecution or that there is a pattern or practice of persecution against gay individuals in Cameroon.

Sama also failed to prove that the record compels the finding that the Cameroonian police are unable or unwilling to control private actors. If an applicant alleges persecution by a private actor, he must prove that he is "unable to avail h[im]self of the protection of h[is] home country." *Lopez v. U.S. Att'y Gen.*, 504 F.3d 1341, 1345 (11th Cir. 2007). Sama never tried to report that a brick was thrown through his window. And when the hospital called the police after the street assault, officers came and interviewed him. True, his attackers were never found. But contrary to Sama's argument, the failure to make an arrest does not prove that the police did not investigate. Although Sama argues that the police "interrogated his classmates and friends about [Sama's] perceived homosexuality and his pro-homosexual views," the immigration judge found that "it is not established whether the police [we]re investigating the arrest warrant against [Sama] or his attackers." The immigration judge was also entitled to rely on the country reports to find that the Cameroonian authorities have been increasingly responsive to

16

threats against gay individuals. *See Djonda*, 514 F.3d at 1175 ("[T]he substantial evidence test does not allow us to 'reweigh from scratch' the importance to be placed on [a State Department] Report." (alteration adopted) (quoting *Mazariegos v. U.S. Att'y Gen.*, 241 F.3d 1320, 1323 (11th Cir. 2001))). Under the "highly deferential" substantial-evidence standard, *Silva*, 448 F.3d at 1237, we cannot disturb the findings of the Board that the police were willing and able to investigate the crimes against Sama and that he is not "unable to avail h[im]self of the protection of h[is] home country." *Lopez*, 504 F.3d at 1345

### B.  The Board Afforded Sama Due Process.

Sama argues that the Board violated his due process rights "when it ignored the arguments in [his] brief and failed to properly review all of the evidence he submitted." In essence, he disputes the weight the Board gave to different portions of the record, and reprises his same arguments that substantial evidence supports the findings of the Board. He argues that "the immigration court . . . failed to examine the evidence in light of [his] credibility and the Board employed language that clearly lessened the weight of [his] evidence." According to him, "[h]e is entitled to the right to have all of the evidence he submitted be given due weight and consideration." We are not persuaded.

Sama's argument that he was denied due process fails. "To establish due process violations in removal proceedings, aliens must show that they were

17

deprived of liberty without due process of law, and that the asserted errors caused them substantial prejudice." *Lonyem v. U.S. Att'y Gen.*, 352 F.3d 1338, 1341–42 (11th Cir. 2003). "Due process requires that aliens be given notice and an opportunity to be heard in their removal proceedings." *Lapaix v. U.S. Att'y Gen.*, 605 F.3d 1138, 1143 (11th Cir. 2010). But Sama received notice and an opportunity for a hearing.

To the extent that Sama argues that the Board violated his right to due process by not considering the evidence he presented, he is incorrect. The Board complied with its statutory requirements. *Cf. Gonzalez-Oropeza v. U.S. Att'y Gen.*, 321 F.3d 1331 (11th Cir. 2003) (rejecting a due-process challenge to an affirmance without opinion by the Board when it complied with the governing regulations). The Board needs only give "reasoned consideration to [a] petition" and "announce its decision in terms sufficient to enable a reviewing court to perceive that it has heard and thought and not merely reacted." *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006) (citations and internal quotation marks omitted). Although the Board must "consider all evidence introduced by the applicant," it is not required to "address specifically each claim the petitioner made or each piece of evidence the petitioner presented." *Id.* (citations and internal quotation marks omitted); *see also Malu v. U.S. Att'y Gen.*, 764 F.3d 1282, 1292 (11th Cir. 2014) ("Neither the immigration judge nor the Board had to address each piece of

18

evidence presented by [the petitioner.]"). And we have explained time and time again that "the substantial evidence test [is] 'deferential,' and . . . we may not 're-weigh the evidence' from scratch." *Mazariegos*, 241 F.3d at 1323 (quoting *Lorisme v. Immigration & Naturalization Serv.*, 129 F.3d 1441, 1444–45 (11th Cir. 1997)). "Our inquiry is whether there is substantial evidence for the findings made by the [Board], *not* whether there is substantial evidence for some *other* finding that could have been, but was not, made." *Id.* at 1324.

The Board explicitly considered at least some of the evidence that Sama argues that it ignored. For example, Sama argues that the Board overlooked evidence that he did not call the police to inform them of the street assault. But the Board expressly acknowledged that the hospital called the police. Additionally, the immigration judge considered that there was a warrant for his arrest, that Sama was in the hospital after an assault by private actors, that he reported the incident when the police visited him, that he testified that he was "most afraid" of private actors, that his mother had been briefly detained, that he was never questioned in connection with the warrant, that Sama's witnesses attested that the police were questioning students believed to be close to Sama, and that recent country reports suggest that the Cameroonian police can offer some protection to gay individuals. Because we may not "re-weigh the evidence from scratch," we cannot make new findings. *Mazariegos*, 241 F.3d at 1323 (quoting *Lorisme*, 129 F.3d at 1445).

19

## IV. CONCLUSION

We **DENY** Sama's petition for review.