[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-12159

_____

Agency No. A206-832-397

GABRIELA ANDREINA CALABRIA MEDINA,
YESBER ALIRIO MARIN HERNANDEZ,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(February 12, 2020)

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

PER CURIAM:

Petitioner Gabriela Andreina Calabria Medina, a native and citizen of Venezuela, appeals a decision of the Board of Immigration Appeals ("BIA") denying her claims of asylum and withholding of removal. According to Medina, she was repeatedly harassed and threatened in Venezuela. She ascribes this mistreatment to her political activism. The BIA rejected Medina's application for relief because it concluded that the abuse she suffered did not rise to the level of persecution. For the reasons set forth below, we deny Medina's petition for review.

## I.    Factual Background[1]

Medina and her husband, Yesber Alirio Marin Hernandez, were political activists in Venezuela before coming to the United States in 2014. In June 2010, Hernandez joined Primero Justicia, a group of young professionals advocating for change in Venezuela. He was made a "parochial leader" at some point, though he never became a high-ranking member of the organization. Medina never officially joined the group but was an active participant in many political campaigns in which Primero Justicia was involved. Most of her work consisted of public activism, such as attending marches, distributing promotional materials, and engaging with potential voters.

---

[1] We derive this summary primarily from Medina's and Hernandez's testimony before the immigration judge ("IJ") on April 27, 2017. Where there are inconsistencies, we have adopted the IJ's factual description, so long as it is supported by the record. *See Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010) ("[W]e must affirm the decision of the Immigration Judge if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole.") (citation omitted).

Medina's and Hernandez's activities put them at odds with the Venezuelan government and its supporters. They were consistently targeted by family and stranger alike. Because these episodes are the basis of Medina's appeal, our discussion warrants additional detail about them.

A. Threats From the Community

Hernandez was from a part of Venezuela that was largely pro-government. His political views made him a target, particularly after he started dating (and later married) Medina, who was from a part of the country that was more supportive of the opposition. Pro-government supporters yelled at and harassed Medina and Hernandez when they were in the area or when the couple was participating in a political activity. But while the interactions sometimes became tense—at one point these supporters damaged Medina's car—Medina and Hernandez were never physically harmed.

Hernandez's family was not spared punishment for their son's activities. In March 2013, Hernandez was told by members of the city council where his family lived that his mother would lose her job, along with certain food allowances and a bonus that she was due, unless Hernandez and Medina stopped their activism. After the election of a politician that Medina and Hernandez had supported, government supporters harassed Hernandez's nephews and stole their book bags, yelling that the boys should ask their uncle to buy them new ones.

3

But despite this mistreatment, Hernandez's family offered little refuge to Medina or Hernandez. Like many families in the community, Hernandez's relatives were supporters of the government. Concerned that Medina was corrupting her son, Hernandez's mother was particularly hostile towards Medina.

B. Threats From the Government

Medina and Hernandez participated in a political march in February 2014. One or two Venezuelan National Guard soldiers approached Medina and Hernandez, identified them by name, and threatened to kill them. Neither Medina nor Hernandez were harmed during this encounter.

C. Workplace Incidents

Medina and Hernandez opened a bakery sometime in 2013. To make their baked goods, the couple acquired milk, butter, flour, sugar and the like. These were products that were rationed by the government. Once their neighbors found out that Medina and Hernandez had these supplies, the neighbors harassed Medina and Hernandez into giving them up.

The harassment was multi-faceted. Initially, the government supporters vandalized the business by writing pro-government slogans on the building's walls and on Medina's and Hernandez's vehicles. The government supporters also drove by the store chanting slogans and scaring away customers. The business suffered as a result.

4

The harassment later became more aggressive.  In May 2014, two men arrived at Medina and Hernandez's shop and demanded that they hand over the regulated goods.  Medina collapsed during the altercation.  A doctor later told her that she was pregnant but at risk of a miscarriage.

Medina and Hernandez closed the store for a few weeks after this incident, but shortly after they reopened, the men returned.  This time they were armed.  Medina was not harmed during this incident, but soon after, she and Hernandez unloaded their remaining supplies and closed the shop.

This did not stop the abuse.  Unidentified individuals called to harass Medina, even after she and Hernandez closed the bakery.  Some of the calls were just to insult the couple, but others were death threats.

Beyond his work at the bakery, Hernandez was an electrical technician at a Venezuelan brewing company, Empresas Polar.  In 2012, Hernandez's colleagues formed a syndicate to be an intermediary between the owners of the company and the workers.  The syndicate supported the Venezuelan government.  Hernandez and others voted against forming the group.  For that reason, Hernandez was denied promotions, made to work unpaid overtime, and denied money he was owed.

D. The Black Truck Incident

Late one night in August 2014, when Medina and Hernandez were leaving Hernandez's mother's home, they observed several cars parked nearby with dark,

tinted windows. This was unusual. Shortly after they started driving, Medina and Hernandez noticed that a black truck was following them. This turned into a chase. The truck was honking at Medina and Hernandez and trying to blind them with its lights. After twenty or thirty minutes, Medina and Hernandez managed to get away from the truck long enough to get to a friend's house and hide in the garage. Medina and Hernandez heard the truck while they were hiding and heard shots being fired. Neither Medina nor Hernandez saw the driver, but the next day, one of their friend's neighbors said that he had identified the driver of the black truck as a member of a government agency. Neither Medina nor Hernandez were harmed during this incident.

E. Flight From Venezuela

Medina and Hernandez fled to the United States on August 24, 2014. The threats against them have continued. Unidentified callers have left threatening voicemails at their home in Venezuela, and Medina's family has observed strange cars that have parked near Medina and Hernandez's home. Hernandez's mother likewise threatened to denounce Medina and Hernandez and turn them over to government supporters after Hernandez told her that they were applying for asylum in the United States.

## II.    Procedural History

Medina and Hernandez were admitted into the United States with a V-2 visa, which authorized them to remain here until September 23, 2014. They did not leave, and on September 24, 2014, Medina filed with the United States Citizenship and Immigration Services ("USCIS") an application for asylum, withholding of removal, and Convention Against Torture ("CAT") relief on behalf of herself and Hernandez.[2]

USCIS denied Medina's application and referred the matter to immigration court. On November 19, 2014, the Department of Homeland Security served Medina and Hernandez with a Notice to Appear ("NTA"), alleging that they were removable pursuant to Section 237(a)(1)(B) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(B), because they had remained in the United States for longer than permitted.

Medina appeared before an immigration judge ("IJ") on January 10, 2017. She admitted the allegations in the NTA and conceded removability but argued that she was entitled to relief.

The IJ rejected Medina's claims in a written decision that was issued in June 2017. He concluded that neither Medina nor Hernandez were credible. The IJ could have denied Medina's claims on that basis, but he also reviewed the merits of her

---

[2] Hernandez did not file an application for relief from deportation, but he may be entitled to relief as a beneficiary of Medina's asylum application if she is successful. *See* 8 U.S.C. § 1158(b)(3).

application.  After doing so, he determined that the harm Medina and Hernandez suffered was neither "persecution" nor tied to their political activities.

A single-member panel of the BIA affirmed in April 2018.  The BIA assumed without deciding that Medina was credible and made no determination about Hernandez's credibility.  Nevertheless, it rejected Medina's appeal after determining that she failed to show that she had previously suffered persecution or had a well-founded fear of suffering persecution if she returned to Venezuela.  The BIA declined to address Medina's other arguments, including that the harm she suffered was "on account of" her political activities.

Medina timely appealed to this Court.  She argues that she is entitled to relief based on her claims of asylum and withholding of removal.[3]

## III.    Standard of Review

We review the BIA's decision, and we review the IJ's decision to the extent the BIA expressly adopted the IJ's opinion.  *See Mohammed v. U.S. Att'y Gen.*, 547 F.3d 1340, 1344 (11th Cir. 2008) (citations omitted).  Because the BIA in this case agreed with the IJ's conclusion that the mistreatment Medina and Hernandez suffered did not rise to the level of persecution, we review both decisions regarding that issue.  *See Al Najjar v. Ashcroft*, 257 F.3d 1262, 1284 (11th Cir. 2001).

---

[3] Medina did not argue in her appeal to the BIA that her CAT claim was wrongly denied and has not raised such an argument in these proceedings.  That claim has been abandoned.  *See Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1228 n.2 (11th Cir. 2005).

8

We review factual findings to determine whether they are supported by substantial evidence. *See Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1350 (11th Cir. 2009). Our review is "highly deferential," and we can reverse findings of fact only when the record "compels" it. *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006) (citations omitted).

We review all legal conclusions de novo. *See Perez-Zenteno v. U.S. Att'y Gen.*, 913 F.3d 1301, 1306 (11th Cir. 2019). Whether particular incidents happened and how they relate to each other are questions of fact, subject to the deferential standard of review. *See Silva*, 448 F.3d at 1236–37. But whether a fact pattern constitutes persecution is a question of law, subject to de novo review. *See Mejia v. U.S. Att'y Gen.*, 498 F.3d 1253, 1257 (11th Cir. 2007).

## IV.    Discussion

An alien may apply for asylum pursuant to 8 U.S.C. § 1158. The BIA has discretion to grant asylum if the alien establishes that he or she is a "refugee." *See* § 1158(b)(1)(A). The following qualify as "refugees":

> Any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A).

9

An asylum applicant bears the burden of establishing that she is a "refugee." *See* 8 U.S.C. § 1158(b)(1)(B)(i).   To do so, she must present specific and credible evidence demonstrating either past persecution on account of a statutorily protected ground, or a well-founded fear of future persecution on account of a statutorily protected ground.  8 C.F.R. § 208.13(b); *see also Perez-Zenteno*, 913 F.3d at 1307. An applicant can satisfy the "on account of" requirement by proving that her membership in the protected class "was or will be at least one central reason" for her persecution.  8 U.S.C. § 1158(b)(1)(B)(i).

To qualify for withholding of removal, an applicant must establish that her life or freedom would be threatened in her country of origin on account of her "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A).  The applicant must demonstrate that she was persecuted in the past or that she would "more likely than not" be persecuted upon being returned to her country of origin.  *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1232 (11th Cir. 2005) (citation omitted); 8 C.F.R. § 1208.16(b).

The IJ's finding that neither Medina nor Hernandez was credible may have been sufficient to deny Medina's claims for relief.  *See Kueviakoe v. U.S. Att'y Gen.*, 567 F.3d 1301, 1304–05 (11th Cir. 2009).  But because the BIA assumed Medina was credible and made no finding about Hernandez's credibility, we assume their testimony was credible.  *See Shi v. U.S. Att'y Gen.*, 707 F.3d 1231, 1234 (11th Cir.

10

2013) ("Since the BIA assumed [petitioner's] credibility, we must do so as well.") (citations omitted); *Sandie v. Att'y Gen. of U.S.*, 562 F.3d 246, 252 (3d Cir. 2009) ("[W]e must assume [petitioner's] testimony is credible because we have no credibility determination to review from the BIA.").

The IJ concluded that Medina was a member of a protected class due to her political activism, and the BIA did not find otherwise. But Medina's claim failed because the IJ determined, and the BIA agreed, that she could not show that she had suffered past persecution or was at risk of future persecution.

We first review Medina's claim, as a basis for her asylum petition, that she suffered persecution while she was living in Venezuela. Then we review her claim that she has a well-founded fear of future persecution if she returns to that country. Finally, we turn to Medina's petition for withholding of removal. We do not consider whether the abuse Medina suffered was "on account of" her political activities because the BIA declined to address that part of the IJ's decision. *See Martinez v. U.S. Att'y Gen.*, 446 F.3d 1219, 1221 n.2 (11th Cir. 2006) (holding that IJ's alternative reasoning for its decision was not at issue in appeal because "the BIA expressly declined to address this alternative holding").

A. Past Persecution

To succeed on her claim, Medina must prove that she was persecuted. Persecution is an "extreme concept, requiring more than a few isolated incidents of

11

verbal harassment or intimidation." *Sanchez Jimenez v. U.S. Att'y. Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007) (citations omitted). This is a high bar: we have previously rejected a petitioner's claim that she was persecuted when she received death threats, holding that the threats were "example[s] of harassment and intimidation, but not persecution." *Silva*, 448 F.3d at 1237. Even a showing of physical harm will not necessarily rise to persecution. *See Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1171–72, 1174 (11th Cir. 2008) (holding that a beating which resulted in a two-day hospital stay was not persecution).

With this standard in mind, we turn to Medina's specific claims. We begin by noting that Medina did not suffer physical harm. And none of the belittlement or threats that Medina was subjected to, at the hands of strangers or Hernandez's family, rose to the legal concept of persecution, either. Those acts of intimidation, while certainly unnerving, are the types of harassment that we have long held fall below the standard. *See Sepulveda*, 401 F.3d at 1231 ("Mere harassment does not amount to persecution.") (citation and alterations omitted).

The acts of aggression towards Hernandez's family do not change this result. We have previously recognized that a petitioner can demonstrate persecution through a showing of harm to another person, "where that act concomitantly threatens the petitioner." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1009 n.7 (11th Cir. 2008). But even if Medina had made that showing—and she has not—

12

this "harm" falls short of persecution.   The IJ found that Medina failed to demonstrate that Hernandez's mother lost her job or any other benefits, and Medina points to nothing in the record that would compel us to find otherwise.   Stealing Hernandez's nephews' book bags does not amount to persecution under our precedent, either.

The threat to Medina and Hernandez from the National Guard soldiers also does not satisfy the definition of persecution.   We have previously recognized that "[a] credible death threat by a person who has the immediate ability to act on it constitutes persecution regardless of whether the threat is successfully carried out." *Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1333–34 (11th Cir. 2010).   But nothing in the record compels a finding that the soldiers intended to, or were even capable of, immediately acting on this threat.

The repeated threats and acts of vandalism that Medina and Hernandez experienced at their bakery were likewise harassment, but they were not persecution. We have previously recognized claims of economic persecution, such as fines that "cause a severe economic disadvantage." *Mu Ying Wu v. U.S. Att'y Gen.*, 745 F.3d 1140, 1156 (11th Cir. 2014) (citation omitted).   The BIA has listed examples of how an alien could establish economic persecution, including being subjected to a "particularly onerous fine" or government sanctions "that reduce an applicant to an impoverished existence," a "large-scale confiscation of property," or a "sweeping

13

limitation of opportunities to continue to work in an established profession or business." *Matter of T-Z-*, 24 I. & N. Dec. 163, 174 (BIA 2007).  This is a difficult showing, and we are not aware of any published decisions from our circuit where an alien successfully demonstrated that she had suffered economic persecution. Medina likewise fails to do so here.  While the record shows that the bakery business suffered, Medina has not demonstrated that she or Hernandez were forced from their jobs, subjected to a financially crushing fine or penalty, or otherwise subjected to the type of harm that might constitute economic persecution.

Medina separately argues that the stress from those episodes caused her to be at risk of a miscarriage.  The IJ rejected that claim.  He concluded that the medical evidence in the case indicated that Medina had a high-risk pregnancy, but it did not suggest that the risk was caused by any of the harassment that Medina had endured. In fact, the IJ said: "[t]he medical record does not indicate that Respondent [Medina] recently experienced any trauma or that this event caused her pregnancy to be at risk. . . ."  Medina does not address that finding.  She simply asserts that the harm was "due to the stress and fear" of the altercation.  Because the IJ's determination is supported by credible evidence that Medina does not meaningfully contest, we must defer to his interpretation of the facts.  *See Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948 (11th Cir. 2010).

14

The mistreatment that Hernandez suffered from the syndicate was also not persecution. This claim fails because the harm was directed towards Hernandez, and Medina was not concomitantly threatened. *See Rodriguez v. U.S. Att'y. Gen.*, 735 F.3d 1302, 1308–09 (11th Cir. 2013). But even if Medina had been the target, this would not be persecution because nothing suggests that the financial harm the family suffered was a severe economic hardship. *See Mu Wing Wu*, 745 F.3d at 1156.

Medina likewise was not persecuted in August 2014 when she and Hernandez were chased by a black truck in the middle of the night. Even this type of harassment does not constitute persecution under our caselaw. That Medina and Hernandez heard gun shots (after taking refuge in a friend's garage) does not change the outcome, though it may have if someone from the black truck had shot *at* them. *Cf. Sanchez Jimenez*, 492 F.3d at 1233 ("We have no difficulty concluding that intentionally being shot at in a moving car multiple times by two armed men on motorcycles qualifies as 'extreme' under any definition. Put simply, attempted murder is persecution."). But Medina's counsel conceded at oral argument that the shots were fired after Medina and her husband hid in the garage, and that there was no evidence that anybody was shooting at them at any time. Oral Argument at 9:20, 11:06, *Medina, et al. v. U.S. Att'y Gen.* (No. 18-12159), http://www.ca11.uscourts. gov/oral-argument-recordings?title=18-12159&field_oar_case_name_value=

&field_oral_argument_date_value%5Bvalue%5D%5Byear%5D=&field_oral_

argument_date_value%5Bvalue%5D%5Bmonth%5D= ("Oral Argument").

This review of Medina's claims does not end our inquiry, though, as we must also consider the cumulative effect of this mistreatment and assess whether that rises to the level of persecution. *See Mejia*, 498 F.3d at 1258 (citing *Ruiz v. Gonzales*, 479 F.3d 762, 766 (11th Cir. 2007)). But the types of cases where we have recognized that cumulative harm amounted to persecution—including the cases that Medina cites—are easily distinguishable from the facts here. For example, the petitioner in *De Santamaria* was dragged by her hair out of her vehicle and attacked, was later kidnapped and beaten, and her family's groundskeeper was executed for refusing to divulge her location. *See De Santamaria*, 525 F.3d at 1003–05, 1009–10. And the petitioner in *Mejia* was physically attacked twice and targeted other times over an eighteen-month period. *Mejia*, 498 F.3d at 1255, 1257–58. During one of the attacks a large rock was thrown at him, and during another, his assaulters forced the petitioner out of his car, put a gun to his head, and then broke his nose with the butt of a rifle. *See id.* The harm in Medina's case, which can be summarized as repeated threats, harassment, and acts of vandalism, is simply not the same.

At oral argument, counsel suggested that the harms collectively constituted persecution because they were done at the direction of the Venezuelan government. Oral Argument at 1:37-3:20. It is certainly plausible that much of the harm Medina

16

suffered came at the hands of supporters of the Venezuelan government. But it is another thing entirely to conclude that the abuse was directed by the government. Neither the BIA nor the IJ reached this conclusion, and the record does not compel it.

Medina has thus failed to show that she suffered past persecution.

B. Future Persecution

An applicant who fails to establish past persecution may nevertheless be eligible for asylum if she can demonstrate a well-founded fear of future persecution in her native country on account of her membership in a protected group. *See Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1232–33 (11th Cir. 2018) (citations omitted). An applicant can do this by establishing either that (i) there is a "reasonable possibility" that she would suffer that persecution if she returned or (ii) she is a member of a group that is subjected to a "pattern or practice" of persecution in that country. *Kazemzadeh*, 577 F.3d at 1352 (discussing 8 C.F.R. § 208.13(b)(2)(i) and (iii)).

Medina's claim fails because she cannot show that she would be persecuted because of the political activism in which she had previously engaged. Medina relies on the U.S. State Department's 2016 Human Rights Report on Venezuela to argue that the Venezuelan government has oppressed its political opponents. But while that report describes several instances of opposition activists being detained or threatened, it appears that the Venezuelan government took those actions in response

17

to contemporaneous political activity.  *See*, *e.g.*, U.S. Dep't of State, Bureau of Democracy, Human Rights and Labor, U.S. Dep't of State, Venezuela Country Report on Human Rights Practices (2016) ("Human Rights Report") at 8 (activists detained before planned rally), 14–15 (activists arrested for collecting signatures), 16 (violence threatened against activists prior to planned march), 22 (protestors detained for heckling Venezuelan president).  The Human Rights Report does not suggest that the government or its supporters would target someone like Medina, who had been politically active half a decade earlier.  *See Sepulveda*, 401 F.3d at 1232 ("[T]he evidence does not indicate [petitioner's] notoriety as an activist would outlast her four-year absence from Colombia.").

Medina's other argument about future persecution—that her mother-in-law has threatened to turn her and her family over to government supporters—also fails. The IJ rejected this argument after concluding that nothing in the record indicated that Medina's mother-in-law's threats would amount to anything.  Our review of the record does not compel us to think otherwise.[4]

Because Medina cannot establish a well-founded fear of persecution if she returns to Venezuela, her asylum claim must be denied.

---

[4] The IJ determined that Medina's application for relief would fail even if Medina had established a well-founded fear of persecution because she could not show that she could not avoid such persecution by relocating to another part of Venezuela.  The BIA declined to address this finding.  We do not do so, either—and Medina has not contested it, in any event—because we have concluded that Medina has failed to establish a well-founded fear of persecution.  *See* 8 C.F.R. § 208.13(b)(2)(ii), (3).

18

C. Withholding of Removal

Medina's appeal of her withholding-of-removal claim also fails. We have previously recognized that the standard for withholding of removal is "more stringent" than the standard for asylum, because an applicant seeking relief under a withholding-of-removal claim must show that it is "more likely than not" that she would be persecuted if she returned to her native country, as opposed to showing only a "well-founded fear." *See Mazariegos v. Office of U.S. Att'y Gen.*, 241 F3d 1320, 1324 n.2 (11th Cir. 2001); *see also Nkacoang v. I.N.S.*, 83 F.3d 353, 355 (11th Cir. 1996) ("If an applicant is unable to meet the 'well-founded fear' standard for asylum, he is generally precluded from qualifying for either asylum or withholding of deportation.").

Medina cannot show that she would more likely than not be persecuted if she returns to Venezuela for the same reasons she cannot show that she has a well-founded fear of persecution. Accordingly, this claim fails.

## V.    Conclusion

Medina's petition for review is DENIED.