W. EUGENE DAVIS, Circuit Judge:
Petitioner Karmjot Singh ("Singh"), a 21 year old native of India and a practicing Sikh belonging to the Mann Party, seeks review of the order of the Board of Immigration Appeals (the "BIA") affirming the decision of an Immigration Judge ("IJ") denying his application for asylum and withholding of removal under both the Immigration and Nationality Act ("INA") and the Convention Against Torture ("CAT") and ordering him removed to India.[1] The BIA affirmed the IJ's denial of asylum because it agreed with the IJ that the Department of Homeland Security ("DHS") carried its burden of establishing both that Singh was safely able to relocate within India to avoid further persecution and that it was reasonable for him to do so. Because we find that the DHS did not produce substantial evidence to make this showing and consequently did not meet its burden, we GRANT the petition for review and REMAND to the agency to exercise its discretion with regards to Singh's asylum claim.
I. FACTUAL AND PROCEDURAL BACKGROUND
In June 2013, Singh, a resident of the Punjab state of India, graduated from the twelfth grade and became a member of the Shiromani Akali Dal Amritsar Mann Party (the "Mann Party")-one of several Sikh-dominated political parties in India. As a new member of the Mann Party, Singh performed a variety of duties, including helping with rally preparations, and recruiting non-members to join the party. After learning that Singh joined the Mann Party, two local members of the Congress Party,[2] Ajay and Ravi, began threatening to beat and kill Singh if he did not join the Congress Party.
In September 2013, Ajay, Ravi, and an unidentified individual approached Singh while he was hanging a flyer for an upcoming Mann Party rally in his hometown of Dasuya. The three individuals threatened to kill Singh if he did not quit associating with the Mann Party and then beat him, forcing Singh to spend one night in a local hospital. Upon his release from the hospital, Singh and his father visited a nearby police station to report the incident. After learning that Singh was a Mann Party member, the attending officer told Singh and his father to leave or he would put them in jail.
In November 2013, Singh attended a Mann Party rally in Dehradun, which is *520 about twenty minutes away from Dasuya. Singh and others were returning to Dasuya when a vehicle bearing the Congress Party logo forced Singh's vehicle to stop. Seven to eight individuals, including Ajay and Ravi, emerged from the Congress Party vehicle and beat Singh and his companions with hockey sticks, baseball bats, and chains while threatening to kill them for affiliating with the Mann Party. During this encounter, one of the Congress Party members told Singh that he was going to be killed because he did not join the Congress Party. The beating ended when another Mann Party vehicle arrived at the scene. Singh spent two nights in the hospital for back and shoulder injuries, and another Mann Party member in the car with Singh suffered a severe injury to his head. The beating was reported in the local newspaper.
Shortly thereafter, while Singh nursed his injuries at home, Ajay, Ravi, and other Congress Party members visited Singh's home. They asked to speak with Singh about Congress Party business, but Singh's father refused to let them see Singh. Singh then went to live with his uncle for two weeks in Jalandhar, which is approximately an hour away from Singh's hometown. While in Jalandhar, Singh remained inside his uncle's house the entire time. To his knowledge, no one from the Congress Party knew where he was, so no one came looking for him. During this time, however, Congress Party members visited Singh's home and told Singh's father they were looking for Singh to kill him.
After two weeks in Jalandhar, Singh traveled to Delhi, where he spent two days. While in Delhi, Singh remained inside and undetected by the Congress Party. From Delhi, Singh fled to Cuba, then Mexico, and ultimately the United States. Shortly after Singh's departure, his family spread the word that he had left India, and Congress Party members stopped visiting his home.
Immigration authorities detained Singh after he crossed into the United States from Mexico, and the government initiated removal proceedings shortly thereafter. At the removal hearing, the IJ found that Singh was credible and that he suffered past persecution on account of his political opinion. The IJ also concluded, however, that the DHS rebutted the presumption that Singh possessed a well-founded fear of future persecution because Singh could safely and reasonably relocate within India. In so finding, the IJ stated that the evidence "demonstrate[d] that [Singh] [wa]s well-accustomed to relocation and that he was previously able to do so without facing harm." In support, the IJ observed that Singh did not suffer harm or see any Congress Party members looking for him while he stayed with his uncle in Jalandhar. The IJ also relied on the fact that Singh, as a child, moved with his family on several occasions due to his father's position in the military. In a brief opinion, the BIA affirmed the IJ's decision for similar reasons. The BIA emphasized that relocation was possible because there was no evidence that members of the Congress Party had a continuing interest in persecuting Singh upon his return to India. Singh timely appealed.
II. STANDARD OF REVIEW
We generally review only the decision of the BIA.[3] However, when, as in this case, the BIA's decision is affected by the IJ's ruling, we also review the IJ's ruling.[4] We review the BIA's and IJ's legal *521 conclusions de novo and their factual findings for substantial evidence.[5] Under this standard, we can reverse a lower court's factual finding only if "the evidence compels a contrary conclusion."[6]
III. DISCUSSION
Because Singh does not challenge the denial of CAT relief and withholding of removal, he has abandoned those issues,[7] and we review only his claim for asylum.
Given the findings by the IJ that Singh was credible and had suffered past persecution on account of his political opinion, Singh's eligibility for asylum turns on a single issue: whether the DHS carried the burden of rebutting the regulatory presumption that Singh possessed a well-founded fear of future prosecution based on its finding that Singh could safely and reasonably relocate within India.[8] The principal case relied on by the IJ and the BIA, Matter of M-Z-M-R ,[9] has an excellent discussion of the DHS's burden to rebut the regulatory presumption. The BIA explained in that case that the DHS must show that there is "a specific area of the country" where the petitioner does not have a well-founded fear of persecution.[10] In the words of the Third Circuit, this requires a showing that relocation to a particular part of the country "would abate the risk of persecution."[11] This is consistent with one of the leading treatises in this area, which states that "[w]here the applicant meets the 'refugee' definition based on past persecution, the DHS must demonstrate that there is a specific area of the country where the risk of persecution to the applicant falls below the well-founded fear level."[12]
Before discussing the record evidence, we first note that the DHS produced no evidence on this issue despite the fact that it bore the burden of proof. At the hearing, the DHS focused on whether Singh had established past persecution. Its argument regarding relocation was, at best, perfunctory, and, as a result, the IJ and the BIA relied exclusively on record evidence produced by Singh-both documentary and non-documentary evidence-to support their finding that Singh could safely relocate within India and that it would be reasonable for him to do so.
The IJ and the BIA pointed to the following non-documentary evidence to support their finding: (1) Singh moved often as a child while his father was in the military; (2) Singh lived undisturbed while living in hiding with his uncle one hour from his home; (3) Singh lived in Delhi undisturbed for two days while preparing to leave India; (4) Singh was persecuted only by Ajay and Ravi, two local Congress Party members, as part of a personal feud, and; (5) Singh had completed the twelfth grade in school and therefore was well educated. In addition, the IJ relied on several excerpts from an August 2012 U.S. Department of Justice report relating to persecution of the Mann Party, which was submitted by Singh at the hearing.
The first fact mentioned above-that Singh moved often as a child before *522 he joined the Mann Party-has little probative value to his mobility now and his ability to safely and reasonably relocate to another part of India. Similarly, the second fact relied on-that Singh lived in hiding with his uncle who lived an hour away from his home for approximately two weeks-also has little relevance. The case law is clear that an alien cannot be forced to live in hiding in order to avoid persecution.[13]
The next point, that Singh's persecution was the byproduct of a personal feud, is unsupported by the record. The DHS suggests that Singh's persecution stems not from different political opinions, but from his relationship with Ajay and Ravi. However, the IJ found that Singh suffered past persecution on account of his political opinion, not a personal vendetta. Moreover, the record indicates that Ravi and Ajay were not the only members of the Congress Party who attacked Singh. The first time Singh was attacked, three Congress party members, including Ajay and Ravi, were involved. In the second attack, seven or eight Congress Party members, including Ajay and Ravi, participated. Although Singh knew the names of two of the Congress Party attackers, his persecution was, as the IJ found, based on his political opinion.
The final fact relied on by the IJ, Singh's completion of the twelfth grade, has some probative value when determining whether it would be reasonable for Singh to relocate to a particular area within India, but it is not probative of Singh's ability to safely relocate.
The documentary evidence the IJ and the BIA relied on also has limited relevance because it is general in nature and not specific to Singh's ability to relocate to any particular location in India. The IJ relied on a passage in the 2012 DOJ report that "while relations between Congress and Mann Party members can at times be strained, there have been significant improvements in recent years." However, that report explicitly states that "no information was found on how the Congress Party treats the Mann Party." That report and the 2014 State Department Report (also produced by Singh but not relied on by either the IJ or the BIA) are general in nature. Those reports do not speak to the relationship between the Congress Party and the Mann Party, and they do not mention whether Mann Party Sikhs can live without fear of persecution anywhere in India.
In reviewing the case law, we have not found a single case where a circuit court has affirmed the BIA on this issue with a record as barren as the one now before us. For example, in Singh v. Holder ,[14] we affirmed the BIA's affirmance of the IJ's finding that DHS successfully rebutted the presumption by showing that a Mann Party *523 member could safely and reasonably relocate within India to avoid future persecution. But in that case, the DHS submitted substantial evidence that the alien could avoid future persecution by relocating "within India to another part of his state or to any of the other 27 states in the country."[15] The DHS's evidence specifically supported its position that the alien could assimilate into Sikh communities in the specific areas of West Bangal, Karnataka, Bihar, Haryana and Bombay.[16] Though Singh and other unpublished decisions in our sister circuits indicate that Sikhs generally are able to safely relocate within India, no case indicates that the DHS can meet its burden without producing any evidence specific to the petitioner's ability as a Mann Party Sikh to safely relocate within his home country.[17] In short, the single document relied on by the IJ does not speak with any specificity to the ability of Mann Party Sikhs to move about or relocate within India or any particular area in India. This is markedly different from the evidence in the cases relied on by the IJ and BIA.
Our case is more similar to Das v. Gonzales .[18] In that case, Das, a citizen of India and a practicing Christian, sought asylum after several violent encounters with Hindu nationalist groups.[19] The BIA found that Das demonstrated past persecution, but that, nevertheless, he was not entitled to asylum because the DHS showed, via a State Department Report and an International Religious Freedom Report, that Das could safely and reasonably locate within India.[20]
The Seventh Circuit reversed, finding that neither the State Department Report nor the International Religious Freedom Report reflected that violence against Christians was "localized."[21] The court observed that although the Religious Freedom Report indicated that three states in India have Christian majorities, those "states are very small, and the DHS did not provide any information about whether it would be reasonable for Das to relocate there."[22] Thus, the Court concluded that given "the fact that it was the DHS's burden to rebut the presumption that Das has a well-founded fear of persecution, the mixed information in the country reports is not enough to support the BIA's finding that Das could safely relocate."[23]
The evidence in this case is similarly lacking. The DHS has not pointed to any record evidence suggesting that Singh could safely and reasonably relocate to another part of India.
On this record, we are compelled to find that the substantial evidence does not support the IJ's conclusion that the DHS rebutted the regulatory presumption. Consequently, we grant Singh's petition for review and REMAND to the agency to exercise its discretion with respect to Singh's asylum claim.
GRANT PETITION FOR REVIEW.
REMANDED.

Singh conceded removability under 8 U.S.C. § 1182(a)(7)(A)(i)(I) as an inadmissible person not in possession of a valid immigration document.

At the time of this incident, the Congress Party was the ruling party in India, as it has been for much of India's independence. In the 2014 Indian general election, however, the Bharatiya Janata Party, a Hindu nationalist group, gained majority control. The Congress Party nevertheless maintains widespread political influence and control throughout India.

Zhu v. Gonzales , 493 F.3d 588, 593 (5th Cir. 2007).

Id.

Majd v. Gonzales , 446 F.3d 590, 594 (5th Cir. 2006).

Gomez-Palacios v. Holder , 560 F.3d 354, 358 (5th Cir. 2009).

See Soadjede v. Ashcroft , 324 F.3d 830, 833 (5th Cir. 2003).

See 8 C.F.R. § 1208.13(b)(1).

26 I & N. Dec. 28 (BIA 2012).

Id. at 33-34.

Lukwago v. Ashcroft , 329 F.3d 157, 181 (3d Cir. 2003).

2 Shane Dizon and Nadine F. Wettstein, Immigration Law Service § 10:87 (2nd ed. 2004).

See, e.g. , N.L.A. v. Holder , 744 F.3d 425, 442 (7th Cir. 2014) (petitioner could not safely relocate since the reason her sister remained safe in Colombia was because she lived in hiding, and "[i]t is an error of law to assume that an applicant cannot be entitled to asylum if she has demonstrated the ability to escape persecution ... by trying to remain undetected"); Essohou v. Gonzales , 471 F.3d 518, 522 (4th Cir. 2006) (time spent hiding in a village did not support the board's finding that the applicant could reasonably relocate internally in Congo); Chen v. Gonzales , 169 F. App'x 25, 27 (2d Cir. 2006) (finding that the BIA erred in concluding that an alien could reasonably relocate within China because his parents demonstrated that such relocation was possible, where parents remained in hiding and were subject to outstanding arrest warrants); see also 3 Charles Gordon et al., Immigration Law and Procedure § 33.04(5)(d) (Matthew Bender, Rev. Ed.). This reasoning applies a fortiori to Singh's two-day stint in Delhi.

598 F. App'x 282 (5th Cir. 2015).

Id.

Id.

Id. See also e.g. , Singh v. Sessions , 699 F.App'x 418 (5th Cir. 2017).

219 F. App'x 543 (7th Cir. 2007).

Id. at 544.

Id.

Id. at 545.

Id.

Id.