[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10023

_____

OLIVIA TERESA D'SOUZA,

                                                            Petitioner,

*versus*

U.S. ATTORNEY GENERAL,

                                                            Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals
Agency No. A088-001-549

_____

Before WILSON, LUCK, and LAGOA, Circuit Judges.

PER CURIAM:

Olivia D'Souza seeks review of the decision of the Board of Immigration Appeals (the "BIA") that affirmed an immigration judge's denial of her application for withholding of removal. In her petition for review, D'Souza, a lesbian woman, challenges the BIA's determinations that she had not suffered past persecution in India, nor had a well-founded fear of future persecution if she returned to India, based on her sexual orientation.

While we empathize with D'Souza's circumstances, especially when considered with the decade-long duration of her removal proceedings, we cannot say that the BIA erred in its decision. Under the substantial evidence test, the record evidence does not compel reversal of the BIA's factual findings on D'Souza's withholding of removal claim. *See Diallo v. U.S. Att'y Gen.*, 596 F.3d 1329, 1332 (11th Cir. 2010). Thus, after carefully considering the parties' arguments and with the benefit of oral argument, we deny D'Souza's petition for review as to both issues.

## I. BACKGROUND

D'Souza is a citizen and national of India who arrived in the United States through a port of entry on a B2 visa in November 2007. Although D'Souza's visa expired in November 2008, D'Souza remained in the United States.

On December 14, 2011, the Department of Homeland Security issued D'Souza a notice to appear ("NTA"), charging her as removable under 8 U.S.C. § 1227(a)(1)(B) for remaining in the United States longer than she was permitted. At an initial hearing on

December 11, 2012, D'Souza admitted the factual allegations in the NTA and conceded the charge of removability.

In 2013, D'Souza filed an application for asylum, statutory withholding of removal, and withholding of removal under the Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"). D'Souza stated that she feared harm or mistreatment if she returned to India because she was forced to live a closeted life as a gay woman in India and was afraid that the Indian government and other individuals would hurt or kill her if she returned.

In a written supplemental statement, D'Souza elaborated upon her fears. First, she recounted an incident, occurring when she was around eleven years old, where she became close with a female classmate, and that classmate's brother had a police officer inform D'Souza to stop contacting the classmate or risk being jailed. She also described her father's abusive tendencies and her fear that he would beat her with a cane if he discovered that she was a lesbian. She relayed how, at the age of twenty-one, she fell in love with a female coworker, but her supervisor, after finding out about the relationship, informed D'Souza that she would be fired for being "queer." D'Souza described how, when her family found out that she was in a relationship with a woman, her father beat D'Souza's girlfriend and her sister tore the girlfriend's shirt. D'Souza's family then followed D'Souza and her girlfriend to her girlfriend's mother's house, where D'Souza's father threatened her girlfriend's family. D'Souza left her family home after that incident

and did not speak to her family for ten years.  Finally, she recalled an incident at a party where police came and beat up gay men in attendance.

D'Souza attached five documents to her application: four news articles detailing the conditions for LGBT individuals in India and the U.S. Department of State's "India 2018 Human Rights Report."  The first article, published after the Indian Supreme Court ruled in favor of decriminalizing same-sex relations in 2018, described the dismissal of a petition seeking civil rights for LGBT individuals.  The second article explained that gangs were using popular phone applications to locate and extort homosexual individuals and referenced two incidents where gay men were beaten and robbed after connecting with someone on a dating application. The third article, published before India's decriminalization of same-sex relations, discussed a lesbian couple's decision to commit suicide due to discrimination and noted the prevalence of "corrective rape" in rural areas.  The last article noted that recent Indian court judgments had laid the groundwork for better protection from discrimination based on sexual orientation and that the Indian government's stance on LGBT rights had evolved considerably, although it asserted that much more was needed to protect people on the basis of sexual orientation in India.

The Department of State's Report indicated that violence and discrimination based on sexual orientation still occurred in India.  The Report noted that the Indian Supreme Court decriminalized same-sex relations in 2018 and that it was too early to

determine how the verdict would translate into social acceptance. It also noted that LGBT persons still faced physical attacks, rape, and blackmail in India, particularly in rural areas, and indicated that police participated in some crimes against LGBT persons, using the threat of arrest to coerce victims not to report the incidents. The Report also noted that several Indian states, with the aid of non-governmental organizations, were offering education and sensitivity training to police.

At a merits hearing before an immigration judge in 2019, D'Souza testified to the following. In the past, D'Souza would at times attend parties with other gay men and women, and the police were often called on them. When the police showed up, the men in attendance were beaten. When D'Souza was in seventh or eighth grade, a police inspector, acting at the request of a wealthy family, threatened her with jail if she did not end her relationship with a girl who was a member of the family. D'Souza speculated that the Indian Supreme Court's ruling decriminalizing homosexuality would not make a difference because the political party in power was "going after" gay individuals. In response to a question about D'Souza's ability to live safely in an Indian city as a lesbian, she could not answer definitively but stated that she would not be permitted to have an open relationship with a woman while residing in India.

D'Souza recounted how she had worked for an airline in India and, right before she started, she was asked whether she was "queer." At the time, she was in a relationship with another

woman, and following this questioning, she and her girlfriend split. Additionally, as to this particular girlfriend, D'Souza testified that her family discovered their relationship, and her father "threw [the girlfriend] out of the house and tore the front of her shirt." D'Souza fled from the house, but her family chased her to her girlfriend's family's home and "created a scene there." When describing her father's use of a cane to beat her, D'Souza noted that it mostly occurred when he was "high" and occurred because of "who [she was]"—a lesbian woman—though she admitted that her father never spoke about her sexual orientation with her.

On cross-examination, she testified that she was still in contact with her ex-girlfriend in India but did not have contact with any other gay people in India. She explained that she had not heard whether persecution of the same type was still occurring in India because her ex-girlfriend did not live openly as a lesbian. She also stated that neighbors would call the police on social gatherings that she attended with gay men and lesbians, where some attendees were arrested and others would lie about their sexuality.

After the merits hearing, the immigration judge denied D'Souza's applications for relief and ordered her removed to India. The immigration judge found her testimony was credible but concluded that she failed to show past persecution. The immigration judge stated that the incidents D'Souza described involving the police, her employer, and her family all occurred in the late 1970s and early 1980s. And the immigration judge noted that while D'Souza had testified to various ugly incidents that occurred while she was

still residing in India, none of it rose to the level of past persecution sufficient to satisfy her legal burden.

The immigration judge accepted that D'Souza had a subjectively genuine fear of returning to India but found that the record failed to support the conclusion that her fear was objectively reasonable. The immigration judge found that the persecution against homosexual individuals in India was not so widespread that D'Souza would be unable to live anywhere in the country should she return. The immigration judge acknowledged D'Souza's concerns about her inability to live freely or openly in India but noted that those concerns were different from stating with certainty that she would be targeted or singled out for persecution, as D'Souza "herself expressed uncertainty as to what would await her should she return" to India. The immigration judge also noted that D'Souza's ex-girlfriend appeared to maintain some semblance of her identity while remaining in India and found that this fact undermined the objective reasonableness of D'Souza's fear.

D'Souza appealed the immigration judge's decision to the BIA. The BIA then issued an order dismissing her appeal.

First, the BIA narrowed the scope of her appeal to her statutory withholding of removal claims. The BIA found that D'Souza had not separately challenged the immigration judge's determination that her asylum claim was untimely filed and that she waived an appeal of her CAT claim because she did not renew her arguments for that claim in her brief to the BIA.

Next, the BIA agreed that the evidence, considered cumulatively, was insufficiently severe to constitute harm rising to the level of persecution. The BIA agreed with the immigration judge that, based on the record evidence and testimony, D'Souza failed to meet her burden to establish that it was more likely than not that she would be persecuted on account of her sexual orientation in India. The BIA noted the immigration judge's consideration of the Department of State Report, which provided that same-sex relations were decriminalized in India and that it was too early to determine how that would translate into social acceptance, including safe and equal opportunities at work and educational institutions. Thus, "[w]hile the evidence in the record establishes that the respondent may face discrimination and harassment in India, such possibilities do not establish that she would be persecuted on this basis." The BIA found that the immigration judge "correctly concluded that [D'Souza's] fear of returning to India is based on speculation that she would be persecuted."

The BIA also noted that the immigration judge had found D'Souza's "fear of future persecution is undermined by the fact that her ex-girlfriend, who is lesbian, continues to safety live in India." The BIA acknowledged D'Souza's testimony that "although her ex-girlfriend did not live openly as lesbian, [she] was unaware of any harm that her ex-girlfriend experienced on account of her sexual orientation." The BIA then found no error in the immigration judge's weighing of this evidence.

The BIA thus affirmed the immigration judge's denial of D'Souza's application of withholding of removal and dismissed her appeal.  D'Souza now seeks review of the BIA's decision.[1]

## II.    STANDARD OF REVIEW

We review the BIA's decision when it does not expressly adopt the immigration judge's opinion.  *Diallo*, 596 F.3d at 1332. When the BIA expressly adopts or explicitly agrees with the immigration judge's findings about an issue, though, we review both the BIA's and immigration judge's decisions as to that issue.  *Thamotar v. U.S. Att'y Gen.*, 1 F.4th 958, 969 (11th Cir. 2021); *Bing Quan Lin v. U.S. Att'y Gen.*, 881 F.3d 860, 872 (11th Cir. 2018).  And if the BIA issues its own opinion but relies on the immigration judge's decision and reasoning without expressly adopting that decision, we review the immigration judge's opinion to the extent that the BIA found the judge's reasons were supported by the record but review the BIA's decision as to matters on which it rendered its own opinion and reasoning.  *Seck v. U.S. Att'y Gen.*, 663 F.3d 1356, 1364 (11th Cir. 2011).

We review factual findings under the substantial evidence test and "must affirm the BIA's decision if it is supported by reasonable, substantial, and probative evidence on the record considered as a whole."  *Diallo*, 596 F.3d at 1332 (quoting *Al Najjar v. Ashcroft*, 257 F.3d 1262, 1283–84 (11th Cir. 2001)).  In applying the substantial evidence test, "we review the record evidence in the light most

---

[1] D'Souza does not seek review of her asylum and CAT claims with this Court.

favorable to the agency's decision and draw all reasonable inferences in favor of that decision." *Id.* (quoting *Ruiz v. U.S. Att'y Gen.*, 440 F.3d 1247, 1255 (11th Cir. 2006)). "Thus, 'a finding of fact will be reversed only when the record compels a reversal; the mere fact that the record may support a contrary conclusion is not enough to justify a reversal of the administrative finding.'" *Id.* (quoting *Ruiz*, 440 F.3d at 1255); *accord Mazariegos v. Off. of U.S. Att'y Gen.*, 241 F.3d 1320, 1324 (11th Cir. 2001) ("Our inquiry is whether there is substantial evidence for the findings made by the BIA, *not* whether there is substantial evidence for some *other* finding that could have been, but was not, made." (emphasis original)).

Finally, we review the BIA's legal determinations *de novo*. *Diallo*, 596 F.3d at 1332.

### III.    ANALYSIS

Under 8 U.S.C. § 1231(b)(3)(A), an alien seeking withholding of removal must show that her "life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." "An alien bears the burden of demonstrating that he more-likely-than-not would be persecuted or tortured upon his return to the country in question." *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003). The alien can meet her burden by showing either: "(1) 'past persecution in [her] country based on a protected ground,' in which case a rebuttable presumption is created that [her] life or freedom would be threatened if [s]he returned to h[er] country; or (2) 'a future threat to [her] life or freedom on a

protected ground in [her] country.'" *Delgado v. U.S. Att'y Gen.*, 487 F.3d 855, 861 (11th Cir. 2007) (quoting *Al Najjar*, 257 F.3d at 1287). Under BIA precedent, D'Souza, a lesbian woman, is a member of a protected group. *See Sama v. U.S. Att'y Gen.*, 887 F.3d 1225, 1232 (11th Cir. 2018); *Ayala v. U.S. Att'y Gen.*, 605 F.3d 941, 948–49 (11th Cir. 2010).

In her petition for review, D'Souza challenges the BIA's decision finding that she had not suffered past persecution nor had a well-founded fear of future persecution. We address these issues in turn.

## A. Past Persecution

As to past persecution, D'Souza claims that the BIA explicitly agreed with the immigration judge's opinion about past persecution, requiring us to review the judge's ruling. She argues that the immigration judge failed to sufficiently analyze the events that constituted past persecution in India and that the BIA misstated the contents of the record when it described the judge's ruling as amounting to a cumulative assessment.

"Persecution is an extreme concept, requiring more than a few isolated incidents of verbal harassment or intimidation." *Delgado*, 487 F.3d at 861 (alteration adopted) (quoting *Sepulveda v. U.S. Att'y Gen.*, 401 F.3d 1226, 1231 (11th Cir. 2005)); *accord Murugan v. U.S. Att'y Gen.*, 10 F.4th 1185, 1192 (11th Cir. 2021) ("[P]ersecution is an extreme concept that does not include every sort of treatment our society regards as offensive." (quoting *Gonzalez v. Reno*, 212 F.3d 1338, 1355 (11th Cir. 2000))). For example, "minor physical abuse

and brief detentions do not amount to persecution." *Murugan*, 10 F.4th at 1192 (alteration adopted) (quoting *Kazemzadeh v. U.S. Att'y Gen.*, 577 F.3d 1341, 1353 (11th Cir. 2009)). Similarly, "mere harassment does not amount to persecution." *De Santamaria v. U.S. Att'y Gen.*, 525 F.3d 999, 1008 (11th Cir. 2008) (quoting *Sanchez Jimenez v. U.S. Att'y Gen.*, 492 F.3d 1223, 1232 (11th Cir. 2007)). In determining whether an alien has suffered past persecution, the immigration judge "must consider the cumulative effects of the incidents." *Delgado*, 487 F.3d at 861. But while the BIA must "'consider all evidence introduced by the applicant,' it is not required to 'address specifically each claim the petitioner made or each piece of evidence the petitioner presented.'" *Sama*, 887 F.3d at 1235 (quoting *Tan v. U.S. Att'y Gen.*, 446 F.3d 1369, 1374 (11th Cir. 2006)).

In addressing past persecution, the BIA affirmed the immigration judge's determination that D'Souza had not established past persecution, as she had not shown that she experienced harm that was sufficiently severe to rise to the level of persecution. The BIA noted that the immigration judge had acknowledged the incidents of harm that D'Souza experienced, e.g., being taken to the police station in eighth grade because of a lesbian relationship; her experience with the airline employer threatening to fire her for being "queer"; and the fact that her parents threw her out of the house and ceased further contact. The BIA also recognized D'Souza's testimony about her father beating her with a cane. Based on all of this, the BIA "agree[d] with the Immigration Judge that considered cumulatively, the harm [D'Souza] described is

insufficiently severe to constitute harm rising to the level of persecution."

As an initial matter, we disagree with D'Souza that the BIA expressly adopted the immigration judge's decision as to this issue. Rather, the BIA only recounted the evidence that the immigration judge considered, noted additional evidence, and agreed with the immigration judge that, considered cumulatively, the harms D'Souza suffered did not rise to the level of persecution. And we review the immigration judge's decision only to the extent the BIA found the immigration judge's reasons were supported by the record. *See Seck*, 663 F.3d at 1364. D'Souza also argues that the BIA erred because it "misstate[d] the contents of the record," *see Jathursan v. U.S. Att'y Gen.*, 17 F.4th 1365, 1374 (11th Cir. 2021) (quoting *Jeune v. U.S. Att'y Gen.*, 810 F.3d 792, 803 (11th Cir. 2016)), by describing the immigration judge's ruling on past persecution as a cumulative assessment. But the BIA independently determined that D'Souza's past experiences in India, "considered cumulatively," were "insufficiently severe to constitute harm rising to the level of persecution." And our review asks whether the BIA's decision is supported by substantial evidence.

Reviewing the BIA's decision and the record evidence, we agree with the BIA that the incidents of harassment and discrimination that D'Souza experienced in India, while wrong, do not rise to the level of persecution as required by our precedent. Our decision in *Sama* is instructive.

In *Sama*, an anti-gay group in the applicant's college attacked him for posting a message in a college publication in Cameroon "supporting homosexuality and asking for equal rights for homosexuals" and protesting the expulsion of his gay friends from the college. 887 F.3d at 1228. In response, the police issued a warrant for Sama's arrest that charged him with "carrying out homosexual activities" but did not arrest him. *Id.* at 1228–29 (alterations adopted). Later, four men attacked Sama, "cut his neck," and threatened to kill him unless he "stop[ped] his homosexual activities." *Id.* at 1228 (alterations adopted). Sama was treated at a hospital for "wounds and a big cut on his neck," a "head ache and swollen face," "serious bleeding," and "other symptoms of an 'assault.'" *Id.* (alterations adopted). After Sama's discharge from the hospital, someone threw a brick through the window of his room, with an inscribed message stating, "we don't want gays in our community." *Id.* at 1229. Two days later, the police attempted to execute the warrant for his arrest at his mother's house, and when his mother refused to tell the police where Sama was, they arrested and detained her. *Id.*

In reviewing the BIA's decision, we found that substantial evidence supported the BIA's finding that Sama did not experience past persecution. *Id.* at 1232. We found that the incidents Sama experienced did "not amount to 'more than a few isolated incidents of . . . harassment or intimidation'" and thus did not "compel" reversal. *Id.* (quoting *Sepulveda*, 401 F.3d at 1231). In doing so, we noted that: (1) "Sama never alleged that he was physically harmed by the police"; (2) "the police expressed an interest in bringing

Sama's attackers to justice when they visited the hospital to take his statement about the attack"; (3) "Sama [never] suggested that he was afraid to speak with the officers at the hospital"; (4) "the police never questioned him about his sexuality or support for gay rights"; (5) he was never arrested or questioned by the police; and (6) he never spent any time in Cameroonian jail. *Id.*

Here, when viewing the evidence in the light most favorable to the BIA's decision, as we must, substantial evidence supports the BIA's finding that D'Souza did not suffer past harms that rose to the level of past persecution. D'Souza testified about several instances of being stigmatized or discriminated against because she had relationships with other women. But these incidents of harm are largely isolated—e.g., one occurring when D'Souza was in middle school (the incident with the police inspector called by the wealthy family), one occurring when she was twenty-one (the incident with her father and her ex-girlfriend), and one occurring at some point when she worked for the airline. While this past discrimination against D'Souza based on her sexual orientation is condemnable, these incidents do not rise to the level of persecution under our precedent. *See De Santamaria*, 525 F.3d at 1008. As to her father's caning of her, D'Souza did not specify how often this occurred and only speculated that it was because she was a lesbian, admitting that her father never spoke of the reason he caned her. *See Murugan*, 10 F.4th at 1192. In light of our decision in *Sama*, we cannot say that these "few isolated incidents of harassment or intimidation" experienced by D'Souza compel a reversal of the BIA's finding that D'Souza did not suffer past persecution. *See Sama*, 887 F.3d at

1232 (quoting *Sepulveda*, 401 F.3d at 1231); *Diallo*, 596 F.3d at 1333. Accordingly, we deny D'Souza's petition as to this issue.

## B. Well-founded Fear of Future Persecution

As to whether D'Souza established a well-founded fear of future persecution in India, she again asserts that the BIA expressly agreed with the immigration judge's decision on the issue. She argues that the immigration judge's conclusion that persecution was insufficiently widespread in India is contrary to the evidence. She asserts that the immigration judge neither concluded her fears were speculative nor made any predictive factfinding of what might happen if she returned to India, even though the Department of State's Report indicated that homosexual individuals faced physical attacks, rape, blackmail, and widespread societal discrimination and violence in India. Further, she argues that the immigration judge erred in finding that her inability to live freely and openly as a member of her particular social group was not a form of persecution.

If an applicant does not establish past persecution, she bears the burden of showing a well-founded fear of persecution by showing the following: (1) she fears persecution based on her membership in a particular social group, political opinion, or other statutorily listed factor; (2) there is a reasonable possibility that she will suffer such persecution if removed to her native country; and (3) she is unable or unwilling to return to her native country because she fears persecution. *Zheng v. U.S. Att'y Gen.*, 451 F.3d 1287, 1291 (11th Cir. 2006); 8 C.F.R. § 208.13(b)(2)(i). "An applicant alleging

fear of future persecution bears the burden of proving '(1) "a subjectively genuine and objectively reasonable" fear of persecution that is (2) on account of a protected ground.'" *Sama*, 887 F.3d at 1232 (quoting *Silva v. U.S. Att'y Gen.*, 448 F.3d 1229, 1236 (11th Cir. 2006)). "An alien can also establish a well-founded fear of future persecution (and does not need to show an individualized risk of persecution) if [s]he proves a pattern or practice of persecuting 'a group of persons similarly situated to [herself].'" *Murugan*, 10 F.4th at 1193 (quoting 8 C.F.R. § 1208.13(b)(2)(iii)). "To prove the existence of a pattern or practice of persecution, the alien must prove that the mistreatment of persons similarly situated is 'extreme and pervasive.'" *Id.* (quoting *Lingeswaran v. U.S. Att'y Gen.*, 969 F.3d 1278, 1291 (11th Cir. 2020)). And an applicant's ability to relocate to a different region in their home country to avoid future persecution may defeat a well-founded fear of future persecution, if, under the circumstances, it is reasonable to expect the applicant to relocate. *See Mazariegos*, 241 F.3d at 1326–27.

After briefing concluded in this case, the BIA issued its published decision in *In re C-G-T-*, 28 I. & N. Dec. 740 (BIA 2023), which D'Souza filed as supplemental authority to this Court. In *C-G-T-*, the applicant testified that his father abused him in the Dominican Republic because of his sexual orientation, and declarations from his relatives stated that they believed the father beat the applicant because the father thought the son was gay. *Id.* at 741. After the applicant came to the United States, the applicant's mother told his father that he was gay, and the applicant was later diagnosed as HIV-positive. *Id.* The immigration judge denied the application

for relief, among other reasons, for failing to show that he was "more likely than not to suffer future persecution because he did not show that anyone in the Dominican Republic, aside from his father, knew he was gay or HIV-positive and would harm him for that reason." *Id.*

In addressing the applicant's fear of future persecution, the BIA stated that "[a]s a general matter, we do not base consideration of an applicant's fear of future harm on the ability or requirement to hide his or her sexual orientation." *Id.* at 745. Thus, the BIA determined that, to the extent the immigration judge's conclusion "could be viewed as based on an assumption that the respondent could avoid future harm by not engaging in conduct that would identify himself as gay, it would be in error." *Id.* The BIA explained that "[s]exual orientation, like other protected grounds, is 'a characteristic that either is beyond the power of an individual to change or is so fundamental to individual identity or conscience that it ought not be required to be changed.'" *Id.* (quoting *In re Acosta*, 19 I. & N. Dec. 211, 233 (BIA 1985)). And it stated that, "when considering future harm, adjudicators should not expect a respondent to hide his or her sexual orientation if removed to his or her native country." *Id.* (citing *Doe v. Att'y Gen. of the United States*, 956 F.3d 135, 154 (3d Cir. 2020); and *Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018)).

Although we do not have precedent explicitly stating whether an applicant for asylum and withholding of removal should be expected to hide his or her sexual orientation to avoid

future persecution in the applicant's home country, we have recognized that the Immigration and Nationality Act ("INA") and its related regulations "do not require applicants who have faced persecution 'on account of race, religion, nationality, membership in a particular social group, or political opinion' to avoid signaling to others that they are indeed members of a particular race, or adherents of a certain religion, etc." *Antipova v. U.S. Att'y Gen.*, 392 F.3d 1259, 1264–65 (11th Cir. 2004) (quoting 8 C.F.R. § 208.16(b)). For example, in *Kazemzadeh*, we found that "having to practice religion underground to avoid punishment is itself a form of persecution" in the case of an Iranian applicant who had converted from Islam to Christianity. *See* 577 F.3d at 1354. And some of our sister circuits have found that an applicant should not be expected to hide his or her sexual orientation to avoid persecution in this context. *See, e.g.*, *Doe*, 956 F.3d at 154; *Karouni v. Gonzales*, 399 F.3d 1163, 1173 (9th Cir. 2005).

Under our precedents in *Antipova* and *Kazemzadeh*, an applicant is not expected to hide her identity in a protected group to avoid future persecution. And persecution based on an applicant's sexual orientation constitutes a protected ground. *See Sama*, 887 F.3d at 1232; *Ayala*, 605 F.3d at 948–49. Therefore, as is the case for other protected groups, the INA and its regulations do not require applicants like D'Souza to avoid signaling their sexual orientations to avoid persecution in their home countries. *See Antipova*, 392 F.3d at 1264–65. We do not read the BIA's decision to suggest that it expected D'Souza to hide her identity and not openly live as a lesbian if she returned to India to avoid future persecution. But, to

the extent that the BIA did so, the decision is inconsistent with its decision in *C-G-T-* and the reasoning in *Antipova* and *Kazemzadeh*.

However, upon reviewing the BIA's decision, we agree that the BIA made a separate independent determination regarding whether D'Souza had shown a well-founded fear of future persecution—specifically, that D'Souza's fear of returning to India was based on speculation. We now turn to whether substantial evidence supports this specific determination.

In making this separate determination, the BIA first cited to the Department of State's India 2018 Human Rights Report. Under our precedent, the BIA is "entitled to rely heavily on" the Department of State's reports about country conditions. *Seck*, 663 F.3d at 1368 (quoting *Reyes-Sanchez v. U.S. Att'y Gen.*, 369 F.3d 1239, 1243 (11th Cir. 2004)). Here, the Department of State's Report notes that the Indian Supreme Court decriminalized same-sex relations in a unanimous verdict. It states that "[a]ctivists welcomed the verdict but stated it was too early to determine how the verdict would translate into social acceptance, including safe and equal opportunities at workspaces and educational institutions." The Report continues that LGBT individuals had "faced physical attacks, rape, and blackmail," as well as "widespread societal discrimination and violence," "particularly in rural areas." And the Report notes that some police forces in India were receiving "education and sensitivity training" for LGBT individuals. An article presented by D'Souza similarly notes that recent Indian court judgments had laid the groundwork for better protection from discrimination

based on sexual orientation and that the Indian government's stance on LGBT rights had evolved considerably. And, in considering the Department of State's Report, the BIA found that D'Souza may face discrimination and harassment in India, but that "such possibilities" did not establish persecution, which the BIA found was speculative.

The BIA also cited to D'Souza's testimony, in which she expressed uncertainty as to what would await her should she return to India. In response to being asked whether she could live safely in an Indian city as a lesbian, D'Souza testified:

> I can't answer that, really. I don't know too much but I know that you cannot have an open relationship kind of a thing. It's the same because it is, the way it is in India, it's like, do they, even though they are ultramodern in their way of dressing, the thinking is still you cannot have a child, period. You cannot live together as a couple.

D'Souza, however, did not testify that she would suffer physical harm nor that the Indian government would be unwilling or unable to protect her from individuals who would target her on account of her identity as a lesbian. *Cf. Sama*, 887 F.3d at 1233–34 (finding that the applicant failed to establish a well-founded fear of persecution, despite his argument that he introduced evidence that authorities persecuted gay activists and look away when they are persecuted, attack or killed, in part because recent country reports stated that conditions were improving).

Viewing this evidence in the light most favorable to the BIA's decision, we find that substantial evidence supports its determination that D'Souza's fear of future persecution was based on speculation. The record evidence relied upon by the BIA shows that: (1) there are some improvements towards acceptance of LGBT individuals in India since 2018, such as the Indian Supreme Court's decriminalization of same-sex relations, although there is uncertainty as to how that will translate into future improvements for acceptance of such individuals; (2) D'Souza expressed uncertainty as to what will happen to her if she returns to India; and (3) even if D'Souza did suffer some future discrimination and harassment because she is a lesbian woman, it would not be considered persecution, as defined by the INA. *See De Santamaria*, 525 F.3d at 1008.

Again, we empathize with D'Souza's case. But while the inferences that D'Souza draws from the record evidence may be reasonable, the record does not *compel* the conclusion that, if she returns to India, she will be singled out for persecution on the basis of her sexuality or that there is a pattern or practice of persecution against lesbians in India. *See Diallo*, 596 F.3d at 1332; *cf. Sama*, 887 F.3d at 1233–34. Accordingly, we deny D'Souza's petition as to this issue because the BIA's determination that D'Souza failed to show a well-founded fear of future persecution is supported by substantial evidence.

## IV.   CONCLUSION

For the foregoing reasons, we deny D'Souza's petition for review.

**PETITION DENIED.**

1                    WILSON, J., Concurring                    23-10023

WILSON, Circuit Judge, concurring in judgment:

Under our deferential standard of review, I concur in the majority's judgment to deny Olivia D'Souza's petition.[1]   I write separately to express concerns with the implications of our decision.

D'Souza's case highlights an important question this court has yet to resolve: to what degree can or should we expect an individual to hide or minimize a protected characteristic to avoid persecution or persecution-like consequences?   The majority concludes that a firm answer to this question is not required because the BIA found D'Souza's fear of returning to India speculative.   I have reservations with this determination because I do not believe that one's ability to live openly can be separated from a risk of future persecution.   Numerous sister circuit rulings prove instructive here, as many persuasively explain the inextricable relationship between one's ability to live freely and openly and a fear of future persecution.

In *Karouni v. Gonzales*, the Ninth Circuit discussed at length how "abstaining from future homosexual acts" essentially requires asking a person "to change a fundamental aspect of [their] human identity."   399 F.3d 1163, 1173 (9th Cir. 2005).   The Seventh Circuit

---

[1] In reviewing Board of Immigration Appeals (BIA) factual findings, we may not "reweigh the evidence from scratch," *Adefemi v. Ashcroft*, 386 F.3d 1022, 1027 (11th Cir. 2004) (quotation marks omitted), and may only reverse where the record "compels it," *Mendoza v. U.S. Att'y Gen.*, 327 F.3d 1283, 1287 (11th Cir. 2003).

23-10023                    WILSON, J., Concurring                    2

reviewed a comparable issue in the context of religious liberties, holding that "[a]sylum exists to protect people from having to return to a country and conceal their beliefs," so it is unreasonable to expect asylum seekers to return to their home country only to "conceal their beliefs." *Shan Zhu Qiu v. Holder*, 611 F.3d 403, 408 (7th Cir. 2010). The Fifth Circuit similarly held that the law is clear that a petitioner "cannot be forced to live in hiding in order to avoid persecution." *Singh v. Sessions*, 898 F.3d 518, 522 (5th Cir. 2018). And in a case analogous to ours—where the petitioner challenged returning to a country where he would have to "suppress[] his identity and sexuality as a gay man" to avoid persecution—the Third Circuit vacated the BIA's denial of asylum, writing that "[t]he notion that one can live a 'full life' while being forced to hide or suppress a core component of one's identity is an oxymoron." *Doe v. U.S. Att'y Gen.*, 956 F.3d 135, 154 (3d Cir. 2020).[2]

D'Souza's case mirrors those considered by our sister circuits. When asked if she would be able to "live safely in a city as a lesbian," D'Souza testified to the following: "I don't know too much but I know that you cannot have an open relationship kind of a thing." Her testimony was informed by her lived experiences in India, which included going to parties where police threatened,

---

[2] Notably, all four circuit decisions referenced in this paragraph reversed the decisions of the BIA to hold that hiding a key aspect of one's identity to avoid harm amounts to a well-founded fear of future persecution.

3                          WILSON, J., Concurring                          23-10023

beat, and arrested gay men in attendance.[3]  The India 2018 Human Rights Report[4] seems to support finding that what D'Souza experienced does not happen in isolation.  The report recounts how "[s]ome police [have] committed crimes against LGBTI[5] persons and used the threat of arrest to coerce victims not to report the incidents."  Considered together, D'Souza's testimony and the Human Rights Report speak to a past—and ever-present reality—of harm LGBTI persons face at the hands of police in India.  Put simply, the threat of violence seems attached to whether she must hide her identity.[6]

---

[3] In making its determination as to D'Souza's claim of past persecution, the majority relies heavily on *Sama v. U.S. Att'y Gen.*, 887 F.3d 1225 (11th Cir. 2018).  There, petitioner Sama sought asylum following an attack at the hands of an "anti-gay group" in his home country.  *Id.* at 1228.  We denied Sama's petition because we found that Sama had never been "physically harmed by police," nor had the police attempted to arrest him or "questioned him about his sexuality or support for gay rights."  *Id.* at 1232.  D'Souza's case is distinguishable however because her record includes examples of sexual orientation-based threats and coercion perpetrated explicitly by police.

[4] In reviewing both past and future persecution the BIA is "entitled to rely heavily on country reports."  *Djonda v. U.S. Att'y Gen.*, 514 F.3d 1168, 1175 (11th Cir. 2008) (quotation marks omitted).

[5] We use the term "LGBTI" consistently to match the term's use in the India 2018 Human Rights Report, where it is used as an acronym for lesbian, gay, bisexual, transgender, and intersex.

[6] D'Souza also submitted evidence in which gay rights activists described lesbians as "fac[ing] a life of double discrimination" because of their gender and sexuality and explained that "[i]t is more common to hear about lesbians

23-10023                    WILSON, J., Concurring                    4

The BIA places significant emphasis on the India Supreme Court's 2018 decriminalization of same-sex relations—while over-looking our country's own history in granting LGBTI-based pro-tections. Same-sex relationships were criminalized across the United States until the early 2000s. *See Lawrence v. Texas*, 539 U.S. 558, 578 (2003). But decriminalization was not a cure all. It took another decade for our Supreme Court to recognize that "[o]utlaw to outcast may be a step forward, but it does not achieve the full promise of liberty." *Obergefell v. Hodges*, 576 U.S. 644, 667 (2015). It is logical to conclude that it may similarly take India years to extend broad protections to LGBTI persons. While decriminalization is a step toward better protection, it is far from a guarantee.

In reviewing cases like D'Souza's, I urge our circuit to move toward that of our sister circuits. One's ability to live freely and openly regarding a protected characteristic should be a critical fac-tor in analyzing a threat of future persecution. Because we have not yet adopted this framework, we must defer to the BIA's deter-mination. For these reasons, I concur in judgment.

---

committing suicide than other members of the [LGBTI] community" because of the unique challenges they face in-country.